583 P.2d 997

**JUST'S, INC., a corporation,
Plaintiff-Appellant,**

v.

**ARRINGTON CONSTRUCTION COMPA-
NY, INC., a corporation,
Defendant-Respondent.**

No. 12078.

Supreme Court of Idaho.

June 30, 1978.

Rehearing Denied Oct. 4, 1978.

C. Timothy Hopkins and Gregory L. Crockett, of Hopkins & French, Idaho Falls, for plaintiff-appellant.

Terry L. Crapo, of Holden, Holden, Kidwell, Hahn & Crapo, Idaho Falls, for defendant-respondent.

BAKES, Justice.

In 1972 defendant respondent Arrington Construction Company and the City of Idaho Falls entered into a contract for the renovation of a five and one-half block portion of the downtown Idaho Falls business area in accordance with Project No. 4B–42, of Local Improvement District (LID) No. 42. The work to be done included the removal and replacement of all streets and sidewalks; the location, removal and replacement of all sewer and water lines; the removal and replacement of electrical services; the removal and replacement of light and traffic control systems; and the addition of trees, shrubs, and other beautification devices. The contract required the defendant to take certain precautions to limit the disruption to the businesses within the area to be renovated. The plaintiff appellant Just's, Inc., operated a retail business in leased premises located within the renovation area.

The plaintiff brought this action alleging in Count I of its complaint that it was a third party beneficiary of the contract and that its business had been damaged by the defendant's failure to complete the project in a timely manner and to provide continuous access to plaintiff's business as required by the terms of the contract. The second count of the complaint alleged similar damage because of the defendant's negligent performance of the contract. The district court initially denied the defendant's motion to dismiss Count I, ruling that the plaintiff was a. third party beneficiary of the contract. However, when the district court later learned that the plaintiff was a lessee and not an owner of property within the LID, it dismissed Count I. After denying defendant Arrington's motion for summary judgment on Count II, the negligence issue was tried to a jury, which returned a verdict in favor of the defendant. On appeal, plaintiff assigns as error the dismissal of Count I of its complaint, and as to the trial of Count II, the refusal to admit certain items into evidence and the giving of certain jury instructions.

I

Absent a manifested intent to the contrary, construction contracts between a contractor and a public body are not generally considered as being for the benefit of third parties, but as being for the benefit of the public entity in the performance of its public duties and the contractor. *Davis v.*

*Nelson-Deppe, Inc.,* 91 Idaho 463, 424 P.2d 733 (1967) (highway construction contract). However, if the provisions of a contract additionally express an intention to benefit third parties, the fact that a public body is a party to the contract does not *ipso facto* deny such intended third party beneficiaries the right to enforce the terms of the contract. *See, e. g., Bush v. Upper Valley Telecable Co.,* 96 Idaho 83, 524 P.2d 1055 (1974); *Yellowstone Pipe Line Co. v. Grant Construction Co.,* 95 Idaho 794, 520 P.2d 249 (1974). The ascertainment of the contracting parties' intent requires a careful review of the contract documents and the circumstances surrounding the contract's formation. *Stewart v. Arrington Construction Co.,* 92 Idaho 526, 446 P.2d 895 (1968).

■ The test which must be satisfied before a third party may enforce the terms of a contract between a private contractor and a public body was clearly set forth in the *Arrington* case:

> "In order to recover as a third party beneficiary, it is not necessary that the individual be named and identified as an individual although that is usually sufficient; a third party may enforce a contract if he can show he is a member of a limited class for whose benefit it was made. [Citation omitted]. The class may be limited either by a narrow description of the injuries to be guarded against and the damages to be paid [citation omitted], or by a similar description of the class to be protected. [Citations omitted]." 92 Idaho at 532, 446 P.2d at 901 (1968).

Application of this test to the instant case raises two issues: (1) Was the contract between the City of Idaho Falls and the defendant, particularly the provisions requiring the defendant to take specified measures to lessen the disruption to the businesses in the area, for the benefit of a limited class? (2) If so, is the plaintiff a member of that class?

## II

At the outset it is important to note that the contract involved in this case is not the typical public works contract, but a contract for the construction of improvements in a local improvement district (LID). Improvements made pursuant to an LID are generally financed in whole or in part by special assessments imposed on the property within the district and benefited by the improvements. *See* I.C. § 50–1717 (repealed in 1976). *See generally, Butler v. City of Blackfoot,* 98 Idaho 854, 574 P.2d 542 (1978). Though not precisely stated, it is evident from the affidavit of Charles J. Just, president and chief executive officer of the plaintiff, that special assessments for the expenses of the improvements made pursuant to this contract have been or will be levied against the property which the plaintiff leases and that "through the provision of its lease, currently being renegotiated, [plaintiff] will be paying the expenses of such improvements directly."

The essence of the theory justifying special assessments in connection with an LID as a means of financing all or part of such public improvements is that the improvements confer special benefits to the property within the LID. This principle has been summarized as follows:

> "Laws recognize a distinction between public improvements which benefit the entire community, and those local in their nature which benefit particular real property or limited areas. The property benefited is usually required to pay the expense of the latter. A local improvement is a public improvement which, although it may incidentally benefit the public at large, is made primarily for the accommodation and convenience of the inhabitants of a particular locality, and which is of such a nature as to confer a special benefit upon the real property adjoining or near the improvement." 14 E. McQuillin, The Law of Municipal Corporations § 38.-11 (3d ed.rev.vol.1970).

> "The foundation of the power to lay a special assessment or a special tax for a local improvement of any character . . . is the benefit which the object of the assessment or tax confers on the owner of the abutting property, or the owners of property in the assessment or special

taxation district, which is different from the general benefit which the owners enjoy in common with the other inhabitants or citizens of the municipal corporation.

. . .

"Special assessment or special taxation, therefore, is lawful and constitutional only when founded upon special benefits accrued from the improvement for which the tax or assessment is laid." *Id.,* § 38.02.

*Accord,* C. Rhyne, Municipal Law, § 29–3 (1957). If the improvements in this 5½ block area were intended primarily for the benefit of the general public and only incidentally for the benefit of downtown businessmen such as the plaintiff, the city could not have financed these improvements by means of an LID and special assessments.

The extent to which the property owners within the LID may control the creation and termination of the district further supports the conclusion that the improvements were intended primarily for the benefit of those within the LID. The Idaho statutes applicable to this case provided that 60% of the "resident owners" of property within the LID could cause its creation, I.C. § 50–1711 (repealed in 1976), and that protests by more than ⅔ of the property owners within the LID would halt all work within the district unless a ¾ majority of all the members of the city council voted in favor of its continuance. I.C. § 50–1715 (repealed in 1976).

In order to finance improvements by means of special assessments in connection with an LID, the law requires that the improvements constitute a direct and special benefit to the property within the district, not merely an incidental benefit shared by the general public. Members of an LID have unique statutory rights regarding the initiation and termination of the LID and the construction of the improvements, rights not shared by the general public. The property within the LID, not the city or the general public, will be directly liable for the special assessments imposed to finance the construction of the improvements. I.C. § 50–1730 (repealed in 1976);

*Hughes v. Village of Wendell,* 47 Idaho 370, 275 P. 1116 (1929). Accordingly, the subject matter of this contract—improvements made pursuant to an LID project—is a factor, though not controlling, in determining whether the contract was intended for the benefit of a limited class of third parties.

### III

The parties included among the special provisions of the contract the following terms:

*"DUST ABATEMENT*

"The Contractor shall continuously and conscientiously take whatever action is necessary to eliminate any dust problems created by his work or operations on the project. This continuous and conscientious dust abatement action is to include sprinkling the excavation piled along the trench(es), sweeping and sprinkling the streets, and any other such related work needed to eliminate the dust problem.

*"BUSINESS ACCESS*

"The Contractor shall keep the *businesses within the project area* continuously advised of his proposed schedule of operations. Access to and from the *various businesses* shall be continuously and courteously provided. Movable pedestrian bridges, sturdily constructed and with adequate handrails, shall be provided where pedestrian access must be maintained over and across new concrete sidewalks, etc.

*"SCHEDULING OF WORK AND LIQUIDATED DAMAGES*

"It is *intended* that this project be completed as rapidly as possible and that the *amount of disruption to the downtown businesses be as minimal as possible.* Any one particular block, or any portion thereof, shall be in an 'under construction' status for no more than thirty (30) continuous calendar days. . . . (Emphasis added).

In another section of the contract entitled "Special Provision Items" the following paragraph appears:

"SP–21 UNDERSIDEWALK BASE-MENTS, FREIGHT DROPS, and COAL CHUTES

. . . . .

"The Contractor shall provide continuous and adequate access to and from the businesses that may be affected by the work on these undersidewalk areas. Pedestrian bridges for this purpose shall be at least six (6) feet wide and shall have adequate strength handrails. They shall be made as safe as possible for pedestrian traffic going to and from the store. When these undersidewalk areas are opened up, and access into the basements of the adjacent stores is thereby also made possible, the Contractor shall take whatever action is necessary to protect the adjacent businesses from robbery, etc. The Contractor's insurance (See General Conditions) should also cover this type of risk."

It is apparent from the language of these provisions that the parties intended to keep to a minimum the disruption to the downtown businesses within the project area and that these provisions, which require the contractor to take specific steps in order to avoid undue disruption to these businesses, were for their benefit. It is for the alleged breach of these provisions that the plaintiff has brought this suit.

These provisions impose a contractual obligation on the defendant to take specific steps to prevent undue injury to a well defined and limited class of third parties. Being the beneficiaries of those provisions, members of that class are entitled to sue for enforcement or breach of those provisions under the principles of contract law specifically recognized in the Idaho statutes and cases. I.C. § 29–102. *Yellowstone Pipe Line Co. v. Grant Const. Co., supra,* is illustrative of this point. In that case a contract between the defendant Grant Construction Co. and the State of Idaho for the construction of a highway provided:

"[W]ork shall not be commenced until all arrangements necessary for the protection [of adjacent property and the properties of utilities] have been made.

"The contractor shall be solely and directly responsible to the owners and operators of such properties for any damage, injury, expense, loss, inconvenience, or delay, or for any suits, actions or claims of any character brought on account of any injuries or damage which may result from the carrying out of the work to be done under the contract." 95 Idaho at 795, 520 P.2d at 250.

In the course of the highway construction the plaintiff's pipe line was allegedly damaged. In its opinion this Court recognized that the contract provision did not merely shift liability for any tortious acts which may have been committed in the course of the construction project from the state to the contractor, but contractually obligated the contractor to make arrangements to protect the property of others from injury and compensate the owners for any property damaged by the construction. Such contract provisions were clearly intended for the benefit of a limited class of third parties, owners and operators of affected property. When the contractor allegedly damaged the plaintiff's pipe line the plaintiff was therefore entitled to sue, as a third party beneficiary, for the defendant's alleged breach of that contractual obligation.

Likewise, the contract provisions in the instant case obligated the defendant to take certain precautionary measures for the benefit of a limited class of third parties, the businesses within the LID. Accordingly, members of that class of third party beneficiaries are entitled to sue for the defendant's alleged breach of those contract provisions.

■ A consideration of the function of this contract from a more general perspective makes this conclusion—that the contract is for the benefit of third parties—even more compelling. The improvements made pursuant to this contract do not merely include the construction of basic curbs and gutters, but the construction of new sidewalks with colored cement, a decorative lighting system, natural rock planters, redwood refuse containers and other improvements designed to upgrade the retail shop-

ping atmosphere in downtown Idaho Falls. In the affidavit filed in opposition to defendant's motion to dismiss, Mr. Just stated:

"[Plaintiff] made every effort to see that said local improvement district was passed, for the reason that downtown merchants needed to upgrade the quality of the shopping environment in downtown Idaho Falls, Idaho, in order to compete effectively with regional shopping centers being developed in areas surrounding the city."

Thus, the typical scenario, duplicated in nearly every city, unfolds. The downtown merchants recognized that because of their deteriorating buildings, the narrow streets, shopping inconveniences and the general unattractive atmosphere of the downtown area they were no longer able to compete effectively with the new, modern and convenient shopping centers and malls being developed on the outskirts of the city. They determined to modernize and upgrade the retail atmosphere of the downtown business area. Since the area is comprised of several separately owned businesses on separately owned property, the most convenient means of organizing, constructing and financing such improvements is an LID. The city then contracted for the improvements and supervised the construction on behalf of the members of the LID for whose benefit the improvements were intended. From this perspective, this case is analogous to the situation this Court encountered in *Bush v. Upper Valley Telecable Co., supra.* In that case the city enacted an ordinance granting Upper Valley a franchise for cable television service in the city and set a rate schedule. With Upper Valley's acceptance of the franchise, a contract was formed between Upper Valley and the city. This Court stated:

"Even a cursory examination of the ordinance and the rate schedule reveals the city's intent to benefit a limited well defined class of people: residents of the city who subscribed to the television cable service. It follows that Bush, as a subscriber, was an intended third party beneficiary of the contract between the city

and Upper Valley. [Citations omitted]." 96 Idaho at 85, 524 P.2d at 1057.

Likewise, an examination of the contract in this case reveals the city's intent to benefit a limited well defined class of people: downtown businesses within the LID. We conclude that this contract, in particular the provisions requiring the contractor to protect the access and environment of the existing businesses, was intended for the benefit of a limited well defined class of third parties.

The trial court, though recognizing that the contract was intended for the benefit of third parties, concluded that this plaintiff as a lessee rather than an owner of property within the LID was not a member of that class. Although this plaintiff, a lessee, could not exercise the same rights with regard to the creation and protest of the LID as the owner of the fee, it nonetheless is the owner of a real property interest, its leasehold, which would be subject to any lien imposed to enforce payment of any special assessments. *See* I.C. § 50–1730 (repealed in 1976). As indicated in Mr. Just's affidavit, the plaintiff will be paying the expenses of the improvements through increases in its rentals. More importantly, the contract itself indicates that the provisions which the plaintiff claims the defendant breached were intended for the benefit of the businesses operating within the LID, not merely owners of the fee. We conclude therefore that this plaintiff is a member of the class of third persons intended to be benefited by this contract and is entitled to sue for its breach.

## IV

The plaintiff also seeks a new trial of Count II, its negligence theory of recovery, because of certain errors which it alleges occurred at the trial. However, we do not reach the merits of these assignments of error because we conclude that Count II fails to state a claim for relief, as the defendant asserted unsuccessfully in the district court. Court II of the complaint alleges in pertinent part:

"2. That defendant has carelessly and negligently and with total disregard for the property of plaintiff, failed to provide continuous access to and from plaintiff's place of business, failed to as rapidly as possible complete said project with as minimal disruption of plaintiff's business as possible, failed to limit the underconstruction status of the block in which plaintiff's business is located to no more than thirty (30) continuous calendar days and failed to complete all portions of said Local Improvement District project on or before October 15, 1972."

The plaintiff claims that the defendant's negligent performance and breach of its contractual duties interfered with the flow of customers into the plaintiff's store, thereby decreasing its sales and net profits. In essence, the plaintiff claims that because of the defendant's negligence it lost business and its profits suffered as a result.

■ At the outset we emphasize that negligent conduct and breach of contract are two distinct theories of recovery. Ordinarily, breach of contract is not a tort, although a contract may create the circumstances for the commission of a tort. *Taylor v. Herbold,* 94 Idaho 133, 483 P.2d 664 (1971). *See also McAlvain v. General Insurance Co. of America,* 97 Idaho 777, 554 P.2d 955 (1976). A tort requires the wrongful invasion of an interest protected by the law, not merely an invasion of an interest created by the agreement of the parties. *Taylor v. Herbold, supra.* Dean Prosser summarized this distinction as follows:

"The fundamental difference between tort and contract lies in the nature of the interests protected. Tort actions are created to protect the interest in freedom from various kinds of harm. The duties of conduct which give rise to them are imposed by the law, and are based primarily upon social policy, and not necessarily upon the will or intention of the parties. . . . Contract actions are created to protect the interest in having promises performed. Contract obligations are imposed because of conduct of the parties manifesting consent, and are owed only to the specific individuals named in the contract." W. Prosser, Handbook of the Law of Torts, § 92 at 613 (4th ed. 1971).

Accordingly, the threshold question we must consider is whether the alleged negligent conduct of the defendant invaded an interest of the plaintiff to which the law of negligence extends its protection. We are concerned here with the duties imposed by the law upon the defendant with respect to the plaintiff's business, not with the duties imposed by the construction contract. The damages claimed by the plaintiff, lost profits, are purely economic losses allegedly suffered as a result of the defendant's negligent diversion of prospective customers of the plaintiff.

■ As a general rule, no cause of action lies against a defendant whose negligence prevents the plaintiff from obtaining a prospective economic advantage.[1] *Union Oil Co. v. Oppen,* 501 F.2d 558 (9th Cir. 1974); Restatement (Second) of Torts, § 766C(c) (Tent. Draft No. 23, 1977); W. Prosser, *supra,* § 130; 1 F. Harper & F. James, The Law of Torts, § 6.11 at 513 (1956); James, Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal, 25 Vand.L.Rev. 43 (1972); Note, Negligent Interference With Economic Expectancy: The Case for Recovery, 16 Stan.L.Rev. 664 (1964). *See also* D. Dobbs, Handbook on the Law of Remedies § 6.4 at 466 (1973). In *Clark v. International Harvester Co.,* 99 Idaho 326, 581 P.2d 784 (1978), a companion to this case, we applied this general rule to deny the recov-

---

1. This case in which the plaintiff seeks recovery for purely economic losses without alleging any attending personal injury or property damage must be distinguished from cases involving the recovery of economic losses which are parasitic to an injury to person or property. It is well established that in the latter case economic losses are recoverable in a negligence action.

Restatement (Second) of Torts, § 766C, comment b, and illustration 5 (Tent. Draft No. 23, 1977). *See, e. g., Rindlisbaker v. Wilson,* 95 Idaho 752, 519 P.2d 421 (1974) (loss of profits resulting from personal injury); *Shields v. Morton Chemical Co.,* 95 Idaho 674, 518 P.2d 857 (1974) (loss of profits resulting from damaged seed beans).

ery of economic losses sustained by a plaintiff who claimed a tractor he purchased was negligently manufactured. Dean Prosser has summarized the rule which we adopted in *Clark,* stating:

"Certain types of interests, because of the various difficulties which they present, have been afforded relatively little protection at the hands of the law against negligent invasions. Thus interests of a pecuniary nature, such as the right to have a contract performed, the expectation of financial advantage, or the integrity of the pocketbook which may be damaged by reliance upon a representation, all present special problems. . .

In general, however, it may be said that the law gives protection against negligent acts to the interest in security of the person, and all interests in tangible property. In other words, negligence may result in liability for personal injury or property damage." W. Prosser, *supra,* § 54 at 327.

With specific reference to interference with a prospective economic advantage, Prosser states:

"The cause of action has run parallel to that for interference with existing contracts. Again the tort began with 'malice', and it has remained very largely a matter of at least intent to interfere. Cases have been quite infrequent in which even the claim has been advanced that the defendant through his negligence has prevented the plaintiff from obtaining a prospective pecuniary advantage; and the usual statement is that there can be no cause of action in such a case. There are, however, a few situations in which recovery has been permitted, all of them apparently to be justified upon the basis of some special relation between the parties. . . . In all probability, as in the case of interference with existing contracts, liability for negligence is not impossible, but it must depend upon the existence of some special reason for finding a duty of care. No case has been found in which intended but purely incidental interference resulting from the pursuit of the defendant's own ends by proper means has been held to be actionable." *Id.,* § 130 at 952.

As applied by the courts, however, the rule has been expressed in different ways and its result explained on various grounds. For example, some courts have simply ruled that the defendant owes no duty to plaintiffs seeking compensation for such purely economic losses. *See e. g., Mandal v. Hoffman Const. Co.,* 270 Or. 248, 527 P.2d 387 (1974) (contractor for a city denied recovery of economic losses resulting from another contractor's negligent performance of its contract with the city). Other courts have reached the same result by applying the doctrine of proximate cause. *See, e. g., Rickards v. Sun Oil Co.,* 23 N.J.Misc. 89, 41 A.2d 267 (1945) (denying merchant on island recovery for lost profits caused by negligent destruction of only bridge connecting mainland with island). Still other courts have found such economic losses to be too remote to permit recovery. *See, e. g. Byrd v. English,* 117 Ga. 191, 43 S.E. 419 (1903) (denying recovery by printer who lost profits because contractor had negligently broken power line supplying electricity to his presses). Courts have also denied recovery of purely economic losses on the ground that they were too speculative. *See, e. g., Cain v. Vollmer,* 19 Idaho 163, 112 P. 686 (1910) (plaintiff denied recovery of profits lost because of lost use of negligently injured jockey); *Dunlop Tire & Rubber Corp. v. FMC Corp.,* 53 A.D.2d 150, 385 N.Y.S.2d 971 (1976) (recovery of lost profits resulting from plant shutdown caused by explosion in neighboring chemical plant denied). This general rule has also been applied in product liability cases to deny recovery of purely economic losses in negligence and strict liability tort actions. W. Prosser, *supra,* § 101 at 665. *See, e. g., Clark v. International Harvester Co.,* 99 Idaho ——, 581 P.2d 784 (1978); *Bright v. Goodyear Tire & Rubber Co.,* 463 F.2d 240 (9th Cir. 1972) (negligence); *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) (strict liability). *Contra, Berg v. General Motors Corp.,* 87 Wash.2d 584, 555 P.2d 818 (1976) (negligence).

Though the rule has been expressed in different ways, the common underlying pragmatic consideration is that a contrary rule, which would allow compensation for losses of economic advantage caused by the defendant's negligence, would impose too heavy and unpredictable a burden on the defendant's conduct. The United States Court of Appeals in *Union Oil Co. v. Oppen, supra,* referring to the rule, stated:

> "[The general rule] has strength. It rests upon the proposition that a contrary rule, which would allow compensation for all losses of economic advantages caused by defendant's negligence, would subject the defendant to claims based upon remote and speculative injuries which he could not foresee in any practical sense of the term." 501 F.2d at 563.

The commentators of the American Law Institute summarize the basis for the rule as follows:

> "Thus far there has been little recognition of any liability for a negligent interference . . . with the plaintiff's acquisition of prospective economic relations. (Cf. § 766B). The explanation usually given by the courts, when one is given at all, is that the harm is too 'remote' for negligence liability and that the defendant's conduct is not the 'proximate cause.' In most of the cases in which recovery has been denied, the defendant has had no knowledge of the contractual or prospective relation and no reason to foresee any harm to the plaintiff's interests; and the decision sometimes has been explained under the rule as to unforeseeable plaintiffs stated in § 281. It seems more likely, however, that it is the character of the contract or prospective interest itself that has led the courts to refuse to give it protection against negligent interference. They apparently have been influenced by the extremely variable nature of the relations, the fear of an undue burden upon the defendant's freedom of action, the probable disproportion between the large damages that might be recovered and the extent of the defendant's fault, and perhaps in some cases the difficulty of determining whether the interference has in fact resulted from the negligent conduct. Whatever the reason may be, there is as yet no general recognition of liability for negligent interference with an existing contract or with a prospective contract relation." Restatement (Second) of Torts, § 766C, comment a (Tent. Draft No. 23, 1977).

This plaintiff is surely not the only person who may have suffered some pecuniary losses as a result of the downtown renovation project. For example, others who may have suffered pecuniary losses could conceivably include not only all the other businesses in the area, but also their suppliers, creditors, and so forth, *ad infinitum.* In contrast to the recognized liability for personal injuries and property damage, with its inherent limitations of size, parties and time, liability for all the economic repercussions of a negligent act would be virtually open-ended. *Stevenson v. East Ohio Gas Co.,* 73 N.E.2d 200 (Ohio App.1946). If the defendant's liability were extended to all those who suffered any pecuniary loss, its liability could become grossly disproportionate to its fault. Such potential liability would unduly burden any construction in a business area.

■ However, there are exceptions to this rule against the recovery of purely economic losses, and the rule need not be applied mechanically. But such exceptions generally involve a special relationship between the parties, W. Prosser, *supra,* at 952; *cf. McAlvain v. General Ins. Co. of America, supra* (insurance agent), or unique circumstances requiring a different allocation of risk. *See, e. g., Union Oil Co. v. Oppen, supra* (commercial fishing grounds damaged by negligent oil spill). However, neither situation is present in this case. We conclude, therefore, that the better result in this case is reached by applying the general rule which limits the recovery of economic losses in negligence actions to those situations involving personal injury or property damage. Since Count II of plaintiff's complaint sought recovery for economic loss only, it should have been dismissed. *See* footnote 1, *supra.*

The order dismissing Count I of the plaintiff's complaint is reversed, and the case is remanded for trial on the merits of Count I. The judgment entered in favor of the defendant on Count II of the plaintiff's complaint is affirmed. *Reversed and remanded* in part, *affirmed* in part.

BISTLINE, J., concurs.

McFADDEN, J., concurs in Parts I, III and IV.

SHEPARD, C. J., and DONALDSON, J., concur in Part IV, but dissent from Parts I, II and III.

DONALDSON, Justice, dissenting.

I am unable to agree with the conclusion reached in Parts I through III of the majority opinion and consequently dissent therefrom.

The majority concludes that the "plaintiff is a member of the class of third persons intended to be benefitted by this contract and is entitled to sue for its breach." *Ante,* p. 1002. With this I cannot agree. Having reached this conclusion, the majority reverses the decision of the district court and remands, authorizing the plaintiff-appellant to proceed in district court on the basis of a third party beneficiary contract. As the majority points out, Count I of the plaintiff-appellant's complaint alleges that it was a third party beneficiary of the contract entered into between the City of Idaho Falls and the defendant-respondent, that the defendant-respondent had breached provisions of the contract, and that as a result of this breach plaintiff-appellant suffered $25,000 in damages. In essence, the plaintiff-appellant claims to have suffered a $25,000 loss in business profits as a result of the defendant-respondent's breach. Presumedly, the majority remands the contract action to allow the plaintiff-appellant to prove breach and damages for lost business profits.

At first blush, the majority opinion appears to be supported by sound legal reasoning. Careful analysis of the contract in question and the pertinent rules of law and policies, however, uncover the basic infirmities contained in the majority opinion.

Every public works contract between a governmental unit and a contractor is, in reality, made for the benefit of the individual inhabitants of the governmental unit. This is true of any public works contract entered into between a contractor and a governmental unit, be the governmental unit a state, county, city or some special taxing or administrative district. In each of these contract situations, regardless of the size or type of governmental unit involved, individual members within the governmental unit receive benefits and pay taxes as a consequence of public works contracts entered into by the respective governmental units. Generally, however, principles of contract law prevent individual members of the public from enforcing the provisions of these contracts as third party beneficiaries. It is only under special circumstances that the individual members of the public are entitled to enforce the provisions of these contracts. Perhaps the best statement of this general principle of law and its exceptions is found in the Restatement (Second) of Contracts:

§ 145. GOVERNMENT CONTRACTS.

. . . . .

(2) In particular, a promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless

(a) The terms of the promise provide for such liability; or

(b) The promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

Restatement, (Second) of Contracts, § 145 (Tentative Draft No. 3, 1967): cf. Restatement of Contracts, § 145 (1932). This general rule and its exceptions are followed in

Idaho. *Yellowstone Pipe Line Co. v. Grant Construction Co., Inc.*, 95 Idaho 794, 520 P.2d 249 (1974); *Stewart v. Arrington Construction Co.*, 92 Idaho 526, 446 P.2d 895 (1968); *Davis v. Nelson-Deppe, Inc.*, 91 Idaho 463, 424 P.2d 733 (1967).

This rule which limits the class of persons who can recover from the contractor-promisor, was developed as a matter of policy. The early cases, such as *H. R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 159 N.E. 896 (1928), formulated this rule and provided the foundation for § 145 of the Restatement (Second) by relying on what must be termed a "legal fiction." These early cases relied on such ambiguous words as "secondary or incidental beneficiaries" in finding that these public works contracts were not for the benefit of the individual members of the public and thus could not be enforced by members of the public as third party beneficiary contracts. In reality, however, it must be concluded that the courts simply wanted to develop this limiting rule as a matter of policy and needed a legal reason or basis for the rule. In the *H. R. Moch* case, Chief Judge Benjamin Cardozo concluded that individual members of the public were only "incidental" or "secondary" beneficiaries to public contracts and thus could not enforce the contract provisions. The actual basis for his holding, however, is found later on in the opinion when he states:

> An intention to assume an obligation of indefinite extension to every member of the public is seen to be the more improbable when we recall the crushing burden that the obligation would impose. [citation omitted] The consequences invited would bear no reasonable proportion to those attached by law to defaults not greatly different.

*Id.* 159 N.E. at 897–898.

In this appeal, the majority concludes that the plaintiff-appellant can enforce the provisions of the contract as a third party beneficiary. The majority concludes that the general rule limiting enforcement is not applicable because it was the intention of the contracting parties that property owners within the LID could enforce the contract. Presumedly, the majority relies upon the exceptions stated in 2(a) of the Second Restatement. The majority bases its decision upon two factors in finding that there was an intent to benefit or an intent to allow individual members to enforce the contract, the first being the general nature of the contract involved, i. e. the general nature of an LID contract. The majority's casual concern for both the general rule limiting enforcement, articulated by the Second Restatement, and the policy considerations, set forth in *H. R. Moch,* have in part prompted my dissent. The second factor upon which the majority relies, i. e. a finding of intent within the provisions of the contract, also deeply concerns me.

Any reliance on the fact that an LID contract is involved is misplaced. Such a contract should be treated no differently than any other public works contract. The majority outlines the theory behind LID contracts and highlights the fact that property owners-taxpayers located in the LID receive special benefits and pay special taxes because of the contract. With this general conclusion, I do not quarrel. The point is, the fact that an LID contract is in issue is irrelevant. The LID contract in question was entered into between the city and the contractor. In such a contract, the contracting governmental unit is the city, although the city acts in a limited capacity. Because of the nature of an LID and the circumstances surrounding its creation, the city is, in reality, only acting in behalf of and as a governing unit for those individuals within the LID. The statutory provisions which provide for the creation of LIDs limit the cities' authority and also limit the city funds obligated as a consequence of the contract. I.C. § 50–1723. For simplicity sake, we will still refer to the city as the contracting governmental unit but actually the contracting governmental unit is the LID or a special subdivision of the city created for the purpose of administration and taxing. The special circumstances surrounding an LID contract should in no way alter the general principles of contract law that apply to public works contracts. The

LID contract is still a contract between a governmental unit and a contractor. Applying the general rules heretofore stated, the contract was for the benefit of the contractor and the governmental unit as an entity, i. e. the LID as a whole. The contract was not for the benefit of the individual inhabitants of the LID. Consequently, the individual members who comprise the governmental unit, i. e. those within the LID, cannot enforce the provisions of the contract absent a manifestation of intent to the contrary.

My worry is that the majority opinion will open the door for numerous third party beneficiary suits involving governmental contracts. There are many special districts created in our Code which allow special taxation of a limited geographic area because special benefits are conferred on the area. *E. g.,* I.C. § 22–2448 provides for special taxation for the control of noxious weeds; I.C. § 21–404 for air navigation facilities; I.C. § 22–206 for county fair board funds; I.C. § 31–864 for museum districts; I.C. § 33–2111 for junior colleges; I.C. § 33–2701 for libraries; I.C. § 39–2805 for mosquito abatement; I.C. § 31–1420 for fire protection in counties; I.C. § 40–1506 for good roads; I.C. § 50–303 for city recreational and cultural facilities; I.C. § 50–309 for city fire protection; I.C. § 50–320 for city cemeteries; I.C. § 67–4913 for public auditoriums. It is my fear that the majority opinion could be construed to allow individuals in these various taxation districts to enforce contracts as third party beneficiaries because a special tax was imposed and a special benefit was received. Such a result is neither correct nor advisable in my opinion.

The second factor relied upon by the majority in finding that the plaintiff-appellant was an intended beneficiary is the specific language in the contract itself which the majority believes shows a manifestation of intent to benefit individuals within the LID. With this conclusion I violently disagree. Thus, I turn to the language of the contract itself.

First, the language found in the contract does not clearly "manifest an intent" that the provisions of the contract can be enforced by individuals within the LID. The only case cited by the majority which presents a truly analogous fact situation is *Yellowstone Pipe Line Co. v. Grant Construction Co., supra.* In *Yellowstone,* the contract involved specially provided that:

> The contractor shall be solely and directly responsible to the owners and operators of such properties for any damage, injury, expense, loss, inconvenience, or delay, or for any suits, actions or claims of any character brought on account of any injuries or damage which may result from the carrying out of the work to be done under the contract.

*Id.* at 794, 520 P.2d at 250. Contrast the contractual language in *Yellowstone* with the language from the contract involved in this appeal. The language from the contract in this case indicates only a general desire on the part of the city to limit disruption of business within the LID. It does not indicate that the contractor will be liable to businessmen-property owners in the area for non-performance and, in point of fact, if any inference can be drawn from the contract language, it would be that businessmen specifically *cannot* enforce the contract.

The majority opinion sets forth four provisions of the contract in support of the contention that businessmen within the LID were intended beneficiaries. *Ante,* p. 1000–1001. The provision relating to "dust abatement" is general and does not articulate a specific "intent to benefit." Those provisions relating to "Business Access" and "Undersidewalks Basements, Freight Drops, and Coal Shutes" manifest an intent to benefit pedestrians and deliverymen, not an intent to benefit businessmen within the area. The critical provision, however, is that relating to "Scheduling of Work and Liquidated Damages"; analysis of this provision eliminates the need of arguing over the meaning of the other provisions. The majority quotes only a part of this contract provision. It is necessary that the whole provision be read to understand its true

meaning. That portion of the provision which the majority fails to quote reads:

"Under-construction" status shall be considered as that time period between the time the first sidewalk, pavement, or pipe removal, etc. is started up to the time that the new sidewalk, curb and gutter and asphalt treated base is completed. The scheduling of the finished asphalt plantmix surfacing may be delayed so that the final plantmix surfacing may be done as continuously, as rapidly, and with as few joints as possible.

It is herewith required that the construction of all portions of the project, excluding the tree and shrub planting and the construction of a ½ block portion of Shoup Avenue between Broadway Street and the alley South of "A" Street, shall be completed on or before October 15, 1972. *The amount of liquidated damages for failure to complete the major portion of the project on time shall be $100.00 per day.* (emphasis added)

First, it must be pointed out that the inclusion of a liquidated damages clause in a contract limits recovery in the event of a breach. In *Idaho State University v. Mitchell,* 97 Idaho 724, 727, 552 P.2d 776, 779 (1976), this Court stated:

[I]f parties to a contract have provided the measure of damages to be recoverable for breach of the duties imposed by the contract, they are bound by such provision and liability thereunder is restricted to the terms of the contract.

The contract in question provides for the measure of damages recoverable in the event of a breach. In addition, since the contract does not specify to the contrary, we must assume that the liquidated damages are to be paid to the contracting party, i. e. the city. Are we to somehow construe the language of the contract whereby the liquidated damages would be paid to the businessmen whose property had been in an "under-construction" status for greater than thirty days. Obviously not. The contract specifies what the measure of damages is to be and who is to receive the damages. Thus, under the clear and unam-

biguous wording of the contract, the plaintiff-appellant was clearly not an intended third party beneficiary under the contract and not entitled to sue the defendant-respondent for a breach of the contract. Had the parties intended that businessmen-property owners within the LID would sue on the contract it would seem logical that the contract would specify that the damages be paid to the aggrieved individual.

Aside from the fact that the language of the contract quite clearly forecloses a contract action by plaintiff-appellant, I am also compelled to attack the majority opinion on the basis of policy. Even assuming that the contract did not contain the liquidated damages provision which prevents plaintiff-appellant from bringing a contract action, I am troubled by the majority opinion because it could lead this Court down a road I feel we should not venture. The fact that the majority has labored to find inferences in the language of the contract which do not exist and which are specifically refuted by other language is not nearly as troublesome as the fact that the majority ignores the policies which prevent enforcement of public works contracts by members of the public.

From a policy standpoint, this Court should critically scrutinize these types of contracts and strictly construe the provisions contained therein. Finding that there is an intent to benefit individual members of the governing unit and thus allowing these individuals to sue not only for general damages, but also for consequential damages such as lost business profits, places an arduous burden on a contractor. The economic consequences to a contractor in such a situation could be catastrophic and most likely unconscionable unless the contractor was fully aware of the responsibility he was shouldering and was being justly compensated for such. Before a contractor is found to be open to such liability, the contract should be eminently clear. No court should subject a contractor to such liability through inference and implication as the majority has done in this case. The stakes are much too high and the consequences too

great to allow recovery because of language which is anything short of unequivocal. The majority opinion is both dangerous and unfair and in light of the opinion, contractors who are adventurous enough to enter into public works contracts should be on notice that they proceed at their own risk. I would advise these adventuresome contractors to demand contracts with wording which clearly identifies and limits their liability.

The majority loses sight of and completely disregards the policy considerations which are the basis of the rule they attempt to avoid. By distinguishing this contract as a special public works contract, even though the distinction is irrelevant, and by finding that this contract impliedly manifests an intent, even though there is no good reason to find such an implication, the majority finds that this public works contract can be enforced by individuals from the general public. I would suggest to my colleagues that a much simpler and cleaner approach would simply be to refuse to follow the general rule stated by § 145 of the Second Restatement. Since § 145 is based on a "legal fiction," the majority could simply refuse to follow the fiction. This approach would avoid the further contortion of an otherwise contorted area of the law. The majority should simply hold that as far as third party beneficiary enforcement is concerned, no special rules apply to public works contracts.

It is my feeling that the policies behind the rule provide sufficient justification for following the legal fiction. If it is the majority's feelings that the policy considerations need not be followed when the size of the governmental unit is small, the possibilities of numerous lawsuits minimal, and the burden on the contractor not as great, I believe they should so indicate.

In addition to stretching the language of ·the contract in question to find that *property owners* within the LID are intended beneficiaries under the contract, the majority goes one step further in finding that a property owner's lessee (Just) is also an intended beneficiary under the contract.

The majority justifies this holding by relying on the affidavit of the plaintiff-appellant Just which states that undoubtedly the costs of the LID will be reflected in his lease payments and therefore found that he had a property interest. The ramifications of such a holding are frightening. Under the facts in this case, allowing Just to stand in the shoes of his lessor will not subject the contractor-obligor to any more possible plaintiffs than merely making the contractor liable to all property owners within the LID. Presumedly, because the majority places special emphasis on the fact that an LID is involved, the majority, at least in part, believes that the general rules preventing enforcement of public works contracts by individual members of the public are not applicable in this case because of the limited number of individuals within the LID (i. e. a limited public). I can foresee a situation, however, where such a result will subject a contractor-obligor to suits from literally thousands of persons, e. g. a situation where a ten story apartment building is located in an LID. Are we to believe that under such a fact situation every tenant in the building could sue the contractor for a breach similar to that alleged in this appeal. In all good faith, I cannot concur in a decision which could lead this Court to such a holding in the future.

SHEPARD, C. J., concurs.

## ON DENIAL OF PETITION FOR REHEARING

BAKES, Justice.

Defendant respondent Arrington Construction Company, Inc., has petitioned this Court for a rehearing, arguing, among other things, that this Court in its original opinion should not have concluded as a matter of law that plaintiff appellant Just's, Inc., was a third party beneficiary of the construction contract, but should have remanded that issue to the trial court to make that determination. However, in *Stewart v. Arrington Construction Co.*, 92 Idaho 526, 446 P.2d 895 (1968), we ruled that the intent to benefit a third party "must be gleaned

from the contract itself unless that document is ambiguous . . . ." 92 Idaho at 532, 446 P.2d at 901. *See also Commercial Credit Corp. v. Chisholm Bros. Farm Equipment,* 96 Idaho 194, 525 P.2d 976 (1974); *Parks v. City of Pocatello,* 91 Idaho 241, 419 P.2d 683 (1966).

An examination of the contract involved here and the uncontroverted portions of the parties' affidavits reveals an intent to benefit a class of third parties, of which this plaintiff is a member. Therefore, the district court erred in granting the defendant's motion to dismiss which, because of the parties' submission of affidavits and their consideration by the district court, was transformed into a motion for summary judgment. I.R.C.P. 12(b) and 56; *Cook v. Soltman,* 96 Idaho 187, 525 P.2d 969 (1974). Although the plaintiff did not move for a summary judgment, the district court was nonetheless empowered to grant it. *See Idaho State University v. Mitchell,* 97 Idaho 724, 733, 552 P.2d 776, 785 (1976); *Glenn Dale Ranches, Inc. v. Shaub,* 94 Idaho 585, 587 n. 4, 494 P.2d 1029, 1031, n. 4 (1972); 10 C. Wright & A. Miller, Federal Practice and Procedure, Civil § 2720 (1973). Under the circumstances of this case, the district court should have ruled as a matter of law that plaintiff appellant was a third party beneficiary of the contract and should have granted the plaintiff partial summary judgment on the issue of its allegation of a third party beneficiary contract. However, we emphasize that we do not reach here or express any opinion with respect to any issues concerning the defendant's alleged breach of contract or the extent of recovery, if any, to which the plaintiff may be entitled under the terms of the contract. Those are factual issues which the district court did not fully consider, and they must be resolved on remand.

Petition for rehearing denied.

McFADDEN and BISTLINE, JJ., concur.

SHEPARD, C. J., and DONALDSON, J., continue to adhere to their original opinions.