90 P.3d 335

**IDAHO POWER COMPANY,
Plaintiff–Respondent,**

v.

**Jay H. HULET, Defendant–Appellant.**

**No. 29627.**

Supreme Court of Idaho,
Boise, March 2004 Term.

April 28, 2004.

Ringert, Clark, Chtd., Boise, for appellant. James D. Reid, Boise, argued.

Salladay, Davis & Miller, Boise, for respondent. G. Lance Salladay argued.

SCHROEDER, Justice.

This case involves a claim by Idaho Power Company of third party beneficiary rights under a lease contract entered into on September 13, 1999, between Jay H. Hulet and Mark and Shauna Comstock. The district court granted summary judgment in favor of Idaho Power, finding such rights to exist. Jay H. Hulet appeals.

## I.

## FACTS AND PROCEDURAL HISTORY

In 1998 and 1999 Idaho Power provided electrical power to Mark and Shauna Comstock pursuant to their irrigation account. The account became delinquent and Idaho Power was unable to collect from the Comstocks. On September 13, 1999, Comstock and Hulet executed a Real Estate Sales Agreement by which Comstock sold his dairy farm to Hulet. Contemporaneously, Hulet entered into a Dairy and Farm Lease Agreement ("Lease Agreement") in which Hulet leased back to Comstock the dairy barn and appurtenant acreage which he had just purchased from Comstock. The Lease Agreement provided that Comstock would make an initial payment of $6,000 on February 1, 2000, and that regular monthly payments of $12,950 would begin on March 1, 2000. The Lease Agreement also incorporated as a provision that Hulet "will pay the past due electric bills on lessee's behalf...." Although the party to whom the amount was owed was not specified in the Lease Agreement, Idaho Power was the exclusive provider of electrical energy in Owyhee County where the property was located. Comstock failed to make any of the payments under the Lease Agreement and breached other material terms.

On October 15, 1999, as the new owner of the real property to which the well and pump were appurtenant, Hulet contacted Idaho Power and requested that the pump and account which had previously been in Comstock's name be transferred to his name. A new account was issued to Hulet in his name as requested.

According to Comstock, Idaho Power's attorney contacted him in June, 2000, to advise him that he had to pay his outstanding bill or that a lawsuit would be initiated against him. Comstock requested that he be given time to look into and resolve the matter. Idaho Power agreed to withhold suit but indicated that it was going to continue to work through him to resolve the unpaid account. Also, according to Comstock, Idaho Power became aware of the Lease Agreement in July, 2000, and was provided a copy of that agreement in August, 2000. In December, 2000, Mr. Comstock again requested that Idaho Power give him additional time to resolve the unpaid power bill.

On December 1, 2000, Comstock and Hulet executed an Acknowledgment and Agreement which acknowledged that the Lease Agreement had been breached and acknowledged that even though Hulet might have failed to notify Comstock of his failure to perform, Hulet did not abandon any of his rights under that lease, including the right of scheduled, timely payments. On January 28, 2001, Hulet and Comstock executed a Lease with Option to Purchase Provision ("Second Lease"). The Second Lease specifically provides that it "supersedes and replaces any Lease and/or Option to Purchase agreements executed by the parties hereto and dated previous to the date hereof." On May 22, 2001, Hulet sent Comstock a Notice of Default requiring immediate cure of Comstock's failure to make payments under the Second Lease. On June 29, 2001, Hulet sent Comstock a Notice of Eviction requiring him to leave the premises leased under the Second Lease.

According to Hulet, at no time after executing the Lease Agreement did either he or his farm manager notify Idaho Power that he would be paying Comstock's past due power bills. According to Hulet, Idaho Power never contacted him or his farm manager that it intended to collect from him. The first indication that Idaho Power made to Hulet of its intention to collect from him was the lawsuit from which this appeal arose.

Idaho Power disputes Hulet's account of the facts, claiming that shortly after entering into the Lease Agreement, Hulet notified Idaho Power about the agreement and that

he was taking responsibility for paying Comstock's past due Idaho Power account. Idaho Power points to the fact that Hulet requested that the account be placed in his name on October 15, 1999, as confirmation of the arrangement. An account was opened in Hulet's name, but it began with a zero balance.

Idaho Power filed a complaint against Hulet on February 4, 2002. Hulet filed a motion to dismiss. Idaho Power filed a motion for summary judgment. The district court found that Idaho Power was informed by both parties of the Lease Agreement and Hulet's assumption of Comstock's payment obligations to Idaho Power. The district court also found that Idaho Power acted on that information by adjusting its account and placing the account in Hulet's name. Further, it was found that Idaho Power transferred the irrigation account into Hulet's name and extended the time for payment and forbore its right to pursue legal action during negotiations between Hulet, Comstock and financial institutions relating to the dairy. The district court also made the findings that Idaho Power provided consideration to Hulet and was a third party beneficiary of the contract and that neither party rescinded the Lease Agreement or notified Idaho Power Company of any intent to rescind the contract. As such, the district court found there to be no genuine issues of material fact presented by either party and that the only issues presented were questions of law. The district court noted that Hulet conceded that there were no issues of fact presented in its cross motion for summary judgment and contended that the intent of the parties was the only fact issue presented by Idaho Power in its motion for summary judgment. Finally, the district court found as a matter of fact that Hulet failed to make any payments or to otherwise honor his obligations to Idaho Power pursuant to the terms of the Agreement between Hulet and Comstock to which Idaho Power was a third party beneficiary, and that as of September 3, 2000, there was due and owing the sum of $65,469.13 with additional interest owed from September 3, 2000, to the date of judgment at the rate of 12% per annum calculated on the principal sum of $45,791.71 or $15.03/day.

## II.

### STANDARD OF REVIEW

The standard of review on appeal from an order granting summary judgment is the same standard that is used by the district court in ruling on the summary judgment motion. *Baxter v. Craney*, 135 Idaho 166, 170, 16 P.3d 263, 267 (2000). All disputed facts are to be liberally construed in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Eagle Water Company, Inc. v. Roundy Pole Fence Company, Inc.*, 134 Idaho 626, 628, 7 P.3d 1103, 1105 (2000). Summary judgment is appropriate only when the pleadings, depositions, affidavits and admissions on file show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. I.R.C.P. 56(c).

## III.

### IDAHO POWER WAS NOT A THIRD-PARTY BENEFICIARY OF THE CONTRACT BETWEEN HULET AND COMSTOCK

Under Idaho law, if a party can demonstrate that a contract was made expressly for its benefit, it may enforce that contract, prior to rescission, as a third-party beneficiary. I.C. § 29–102;[1] *Baldwin v. Leach*, 115 Idaho 713, 769 P.2d 590 (Ct.App. 1989). The test for determining a party's status as a third-party beneficiary capable of properly invoking the protection of I.C. § 29–102, is whether the agreement reflects an intent to benefit the third party. *Stewart v. Arrington Constr. Co.*, 92 Idaho 526, 446 P.2d 895 (1968). The third party must show that the contract was made "primarily for his benefit, and that it is not sufficient that he be a mere incidental beneficiary." Further, "[T]he contract itself must express an intent to benefit the third party. This intent must

1. "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." I.C. § 29–102.

be gleaned from the contract itself unless that document is ambiguous, whereupon the circumstances surrounding its formation may be considered." *Adkison Corp. v. American Bldg., Co.,* 107 Idaho 406, 409, 690 P.2d 341, 344 (1984).

As noted in *Adkison Corp.,* a party must show that the contract was made for its direct benefit, and that it is not merely an indirect beneficiary. *Id.* 107 Idaho at 409, 690 P.2d 341. An example of this principle is found in *Just's Inc. v. Annington Constr. Co. Inc.,* 99 Idaho 462, 463, 583 P.2d 997, 998 (1978), in which a contract between the city of Idaho Falls and a construction company contained a provision that specifically required the construction company to take precautions to limit the disruption to the businesses within the area to be renovated. Just's Inc., was a retailer within the renovation area. Arrington failed to provide continuous access to Just's Inc. and Just's Inc. sued. *Id.* This Court framed the issue as follows:

> (1) Was the contract between the City of Idaho Falls and the defendant, particularly the provisions requiring the defendant to take specified measures to lessen the disruption to the businesses in the area, for the benefit of a limited class? (2) If so, is the plaintiff a member of that class?

*Id.* at 464, 583 P.2d 999. The Court reasoned that the provisions in the contract imposed a contractual obligation on the defendant to take specific steps to prevent undue injury to a well defined and limited class. In *Just's,* there is no question that the provisions were intended to protect the businesses in the area, and as such, Just's Inc.'s status as third party beneficiary was clear. That is not the case in the agreement between Hulet and Comstock.

17A Am.Jur.2d § 441. *Construction of contract in general*—further explains the "intent" doctrine laid out by the Court in *Just's Inc.:*

> The question whether a contract was intended for the benefit of a third person is generally regarded as one of construction of the contract. The intention of the parties in this respect is determined by the terms of the contact as a whole, construed in the light of the circumstances under which it was made and *the apparent pur-*

*pose that the parties are trying to accomplish.*

*Id.* (emphasis added).

■ What is clear from the various affidavits and arguments is that Comstock was in serious financial difficulty, evidenced by his inability to fulfill his obligations under either the Lease Agreement or the Second Lease and further established by his eventual bankruptcy. In addition Hulet had been buying land in the area for some time, and according to Idaho Power's attorney, "Mr. Hulet runs multiple thousands of acres on Murphy Flats and owns a good share of it. I would say probably better than 75 percent of that property is under his ownership and he leases it out to different people ... He has written leases with everybody." According to Comstock:

> In approximately August 1999, I began negotiations with Jay Hulet to have Mr. Hulet purchase the farm property I had purchased, subject to his assuming certain obligations ... and my power bill, which were in arrears at that time. I would then lease back from Mr. Hulet the property, and would pay him a monthly lease amount.

Over the next year Comstock's financial condition apparently did not improve, and he did not fulfill his obligations under the Lease Agreement. In danger of losing his ability to operate his dairy and farm on the leased property, the parties entered into the Second Lease. As Comstock stated in his affidavit:

> In January 2001, an agreement was reached between Hulet, Yanke and me, which *I believed would allow me the opportunity to continue to operate* the dairy and farm, and to get Jay Hulet to pay the Idaho Power bill.
>
> . . . .
>
> Idaho Power, with knowledge of the Farm and Dairy Lease Agreement in which Mr. Hulet assumed my obligation to Idaho Power for my unpaid bill, agreed to delay its legal action and allowed me the opportunity to attempt to get Mr. Hulet to pay the power bill which he had agreed to pay for the last 6 months during which time I always believe that Mr. Hulet would pay

the power bill which he had assumed and agreed to pay as part of our lease agreement.

. . . .

I have recently been advised that Mr. Hulet has still not paid the power bill which I had incurred and which *he agreed to pay as part of the consideration for the Real Estate Purchase Agreement and Farm and Dairy Lease* dated September 13, 1999.

. . . .

Idaho Power was aware of the Farm and Dairy Lease Agreement in July 2000, and was provided a copy of that agreement in August 2000. Idaho Power, in reliance on the agreement and my statements and assurances that payment would be forthcoming either from me, or from Mr. Hulet, agreed to extend the time for payment and provided me the opportunity to obtain payments from Mr. Hulet, which I was never able to do.

. . . .

The purpose of the provision in the Farms and Dairy Lease which specified that Mr. Hulet, as the lessor, would make the power bill payments was to assure that Idaho Power Company was paid the money it was owed and *that was a key provision to me, and was a critical factor in my agreeing to lease the farm and dairy from Mr. Hulet after he purchased the property from me.*

(emphasis added).

What is clear is that Comstock wanted to continue operating the farm and dairy and that this arrangement allowed him to do so. What is also apparent is that Hulet had been purchasing farms and dairies in the area for some time and routinely entered into lease agreements. Although Idaho Power would have benefited from Hulet making the payment as he promised to Comstock, it is unlikely that either Comstock or Hulet was concerned with the fate of Idaho Power or protecting its rights. Comstock was on the brink of bankruptcy and needed to lessen his debt load. One of the major financial dilemmas he faced was a mounting power bill. Hulet wanted to increase his landholdings and offered to pay the bill, as Comstock

stated, "as part of the consideration for the Real Estate Purchase Agreement and Farm and Dairy Lease."

Both Idaho Power and the district court refer to *Treasure Valley Foods v. JM Poultry Packing Co.*, 98 Idaho 366, 564 P.2d 978 (1977), as "a case which is factually similar to the case before the Court." Reliance on this case is misplaced. In *Treasure Valley Foods*, the defendant purchased a business in its entirety as a going concern. In doing so it acquired the business' assets and liabilities in their entirety. In this case Hulet purchased the land and buildings associated with Comstock's farm and dairy but did not purchase his business as a going concern. Hulet acquired the land and structures and leased them back to Comstock so he could continue to operate his business. Nothing suggests that Hulet owned Comstock's dairy animals or crops or hired him as an employee as was the case in *Treasure Valley Foods*. *Treasure Valley Foods* is distinguishable from this case, and as such, is not useful in deciding whether or not Idaho Power was a third party beneficiary.

The record indicates that Comstock needed the bill paid to be able to pay the lease payments and Hulet agreed to pay the bill to ensure that his tenant was able to continue in business and make the payments as agreed. Each party agreed to the provision to protect his own interests. While Idaho Power would benefit from payment, the primary purpose of the Lease Agreement was not to protect Idaho Power but to provide Hulet with rent and to allow Comstock to have a realistic chance to profitably run the dairy. Hulet's agreement to pay the power bill was not intended to specifically benefit Idaho Power but as consideration of the agreement to benefit Comstock who sought a situation in which he would be able to continue to run his dairy business. Idaho Power was not a third party beneficiary of the Agreement.

## IV.

## CONCLUSION

The district court's grant of summary judgment is reversed. Hulet is awarded costs.

Chief Justice TROUT, Justices KID-WELL, EISMANN and BURDICK concur.