WISCONSIN BANKERS ASSOCIATION (INCORPORATED), a Wisconsin nonstock corporation, on behalf of its members, and Kilbourn State Bank, a Wisconsin banking association, and Grafton State Bank, a Wisconsin banking association, on behalf of all state or federally charted banks in Wisconsin, Plaintiffs-Appellants-Petitioners,

v.

MUTUAL SAVINGS & LOAN ASSOCIATION OF WISCONSIN, a Wisconsin savings & loan association, Defendant-Respondent.†

Supreme Court

*No. 77–347. Argued February 6, 1980.—Decided May 13, 1980.*

(Also reported in 291 N.W.2d 869.)

† Motion for reconsideration denied, with costs, on June 27, 1980.

For the appellants-petitioners there were briefs by *James P. Brody, Lawrence J. Bugge, Thomas L. Shriner, Jr.,* and *Foley & Lardner* of Milwaukee, and oral argument by *Mr. Brody*.

For the respondent there were briefs by *Edward A. Dudek, James D. Friedman* and *Frisch, Dudek & Slattery, Ltd.,* of Milwaukee, and oral argument by *Edward A. Dudek*.

A brief amicus curiae was filed by *Bronson C. La Follette,* attorney general, *John E. Armstrong,* assistant attorney general, and *William R. Hotz,* of counsel, all of Madison, for Wisconsin Commissioner of Savings and Loan.

A brief amicus curiae was filed by *John K. MacIver, W. Charles Jackson* and *Michael, Best & Friedrich,* all of Milwaukee, for Savings League of Wisconsin.

WILLIAM G. CALLOW, J. On this review, we consider the legality of Mutual Savings and Loan Association's Supreme Account II.

## I.

Mutual Savings and Loan Association of Wisconsin (Mutual) is a state chartered savings and loan association. It is the third largest savings and loan in the state. In September of 1974, Mutual wrote to the Wisconsin Commissioner of Savings and Loan advising him that it was considering offering, at some future date, a service called Supreme Account II. As characterized by the court of appeals, this account is "a service by which a savings and loan depositor can authorize payment from his savings account directly to a third party by issuing a negotiable sight draft drawn on his account and payable to the named payee." On April 9, 1976, Mutual notified the Commissioner it was proceeding to implement the account. The letter outlined the legal support for the service and requested an opinion of the Commissioner with regard to its legality. On April 16, 1976, the Commissioner responded by a letter in which he concluded that there was an "absence of any prohibition [in the governing statutes] against the form of withdrawal you have proposed" and that the account was therefore legal. Mutual offered Supreme Account II to the public on May 14, 1976, becoming the first savings and loan association in Wisconsin to offer this service.

Each Mutual customer desiring a Supreme Account II makes an initial deposit of $100, executes a signature card and an account rules agreement, and then receives a supply of sight drafts or payment orders which may be

drawn on the association and against the customer's funds. The sight drafts provide spaces for the date, name of the payee, amount of the draft, and the depositor's signature as drawer. Once the sight drafts are issued, they are collected by presentation to Mutual through the Milwaukee office of the Federal Reserve Bank of Chicago, with the aid of First Bank-Midland. The items are presented daily with a cash letter summary, and Mutual has until midnight of the day following presentment to advise the Federal Reserve of any items which are not properly payable.

Mutual's customers who have opened such an account can fill in the drafts, sign, and deliver them to a payee in return for goods or services, to obtain cash, or otherwise negotiate them. The payee can negotiate the item or deposit it with his own financial institution so that the draft may be collected from Mutual. Withdrawals from a Supreme Account II are posted to the account as a cash withdrawal in the same fashion as they would be if the customer had personally come into a Mutual office. To accommodate the provisions of sec. 215.17, Stats., Mutual reserves, in the account rules agreement, the right to require thirty days' notice prior to payment of the sight draft; in practice, this requirement is waived. The customer receives a monthly statement listing all account deposit and withdrawal transactions (whether accomplished by draft or otherwise) occurring during the statement period. The rate of earnings payable on funds held in a Supreme Account II was established by Mutual's board of directors as zero percent.

Plaintiff Wisconsin Bankers Association (WBA) had discovered only a day or two before Mutual's announcement and offering of Supreme Account II what Mutual was planning to do. It had heard that the Commissioner of Savings and Loan had authorized Mutual to offer the account. The WBA wrote the Commissioner on May 13, 1976, arguing that "any attempted action . . . by a sav-

ings and loan association [to offer negotiable orders of withdrawal would be] *ultra vires* in nature." (Emphasis in original.) The Deputy Commissioner replied that Mutual was not acting on the Commissioner's authority but was merely taking advantage of the "broad statutory power to offer savings accounts without any statutory or administrative restrictions governing the form that those withdrawals may take" and "the absence of such restrictions on the use of [negotiable orders of withdrawal] in connection with savings accounts."

On Monday, May 17, 1976, three days after Supreme Account II was announced and offered by Mutual, the WBA and two of its members as representative plaintiffs commenced this class action on behalf of all commercial banks in Wisconsin, seeking temporary and permanent injunctions to prevent Mutual from offering Supreme Account II or any similar account. The circuit court granted a temporary restraining order pending hearing on the application for a preliminary injunction. Following an evidentiary hearing, the circuit court denied the temporary injunction and dissolved the restraining order. Mutual then resumed offering the account.

The action was then advanced for trial. After four days of testimony, the circuit court filed an opinion on August 17, 1977, concluding that the Supreme Account II was a legal account and denying the requested permanent injunction. Judgment, dismissing the complaint upon its merits, was entered on October 7, 1977.[1]

[1] In an order dated June 23, 1976, the trial court denied Mutual's motion to dismiss for the plaintiffs' lack of standing. Mutual did not appeal from the denial of its motion to dismiss, and the plaintiffs' standing to bring this action has not been challenged in this court or in the court of appeals.

As we have recently noted, Wisconsin courts generally require that a plaintiff possess standing not as a jurisdictional prerequisite but rather as a matter of sound judicial policy. *State ex rel. First National Bank of Wisconsin Rapids v. M & I Peoples Bank*

The court of appeals affirmed the judgment of the circuit court. *Wisconsin Bankers Asso. v. Mutual Savings & Loan Asso.*, 87 Wis.2d 470, 275 N.W.2d 130 (Ct. App. 1978). On March 26, 1979, we granted the plaintiffs' petition for review.

On review, the plaintiffs argue that the Supreme Account II is not a savings account, as required by sec. 215.13(1), Stats.; that Mutual is illegally engaged in the banking business by offering the account; and that Mutual is not paying withdrawals from the account "to the owner" and "[to] the saver," as required by sec. 215.-17(1) and (4)(a). While we reject the plaintiffs' first and second contentions, we hold that Mutual's use of negotiable orders of withdrawal is inconsistent with the statutory mandate that withdrawals be paid "to the owner" and "[to] the saver." Accordingly, we reverse.

## II.

In the trial court, the plaintiffs presented extensive testimony by an expert witness regarding the meaning of the term "savings account." As explained in that testimony, the commercially accepted definition and the ordinary meaning of the term "savings account" prescribe the existence of three characteristics: (1) a savings account is interest bearing; (2) it is subject to a requirement of prior notice of withdrawal; and (3) withdrawals from it may be paid only to its owner. Be-

*of Coloma*, 95 Wis.2d 303, 308 n. 5, 290 N.W.2d 321, 325 n. 5 (1980). While we are not foreclosed from the question of the plaintiffs' standing by Mutual's failure to present the issue (*see, e.g., Scharping v. Johnson,* 32 Wis.2d 383, 395, 145 N.W.2d 691 (1966); Appendices and Briefs, Vol. 2958, No. 7), we do not believe resolution of the case on these grounds would be appropriate, and we will review the decision of the court of appeals on the merits. However, in doing so, we express no view as to whether any of the plaintiffs possess standing to question the legality of Mutual's offering the Supreme Account II.

cause the rate of earnings payable on funds held in a Supreme Account II was established as zero percent and because, the plaintiffs allege, withdrawals from a Supreme Account II are paid to anyone who presents the account owner's draft, the plaintiffs claim the Supreme Account II is not a savings account within the meaning of sec. 215.13(1), Stats.; and Mutual is not allowed to accept payments on such an account.

We cannot agree. Rather than import the usage of the term's generally accepted meaning, the legislature chose to restrict "savings account" by definition. Sec. 215.01(24), Stats., states that " '[s]avings account' means the monetary interest of the owner thereof in the aggregate of savings accounts in the association and consists of the withdrawal value of such interest." This legal definition must be given effect. *State v. Schaller*, 70 Wis.2d 107, 110, 233 N.W.2d 416 (1975). "As a rule, '[a] definition which declares what a term "means" . . . excludes any meaning that is not stated.' " *Colautti v. Franklin*, 439 U.S. 379, 392 n. 10 (1979), *quoting* 2A Sands, *Statutes and Statutory Construction*, sec. 47.07 (4th ed. Supp. 1978). Thus on the issue of whether a Supreme Account II is a "savings account," as defined in sec. 215.01(24), it is of no consequence that the rate of earnings payable on Supreme Account II is zero percent or that withdrawals may be paid to someone other than the account owner; these characteristics, while perhaps features of the term's ordinary meaning, are not required by the statutory definition of the term.

The plaintiffs have never contended that the Supreme Account II does not meet the statutory definition of savings account. Nor could they successfully do so. We conclude that a Supreme Account II is a savings account as that term is employed in Chapter 215, Stats., and,

consequently, that Mutual is authorized to accept deposits on such accounts, pursuant to sec. 215.13(1).

## III.

The plaintiffs also contend Mutual's offering the Supreme Account II constitutes the illegal conduct of a banking business. Sec. 224.03, Stats., makes it unlawful "for any person, copartnership, association, or corporation to do a banking business without having been regularly organized and chartered as a national bank, a state bank, a mutual savings bank, or a trust company bank." The term "banking business" is defined in sec. 224.02:

> "The soliciting, receiving, or accepting of money or its equivalent on deposit as a regular business by any person, copartnership, association, or corporation, shall be deemed to be doing a banking business, whether such deposit is made subject to check or is evidenced by a certificate of deposit, a pass book, a note, a receipt, or other writing, provided that nothing herein shall apply to or include money left with an agent, pending investment in real estate or securities for or on account of his principal."

The plaintiffs assert that Supreme Account II is a "deposit . . . subject to check" and a deposit within the proscription of Chapter 224, Stats., and that the account is therefore illegal. We disagree.

In *State ex rel. Rohn S. Mfg. Co. v. Industrial Comm.*, 217 Wis. 138, 258 N.W. 449 (1935), it was contended that an association, not chartered as a bank and unauthorized to do a banking business, was engaging in illegal banking in violation of secs. 224.02 and 224.03, Stats., by its solicitation and receipt of money on deposit. The association was licensed and authorized to engage in business as an "investment company" under secs. 216.01, 216.02 and 215.38 to 215.47, Stats. 1929. Sec. 216.01 then required that no corporation "doing business as a

so-called investment . . . company, . . . and which . . . shall solicit payments to be made to . . . itself . . . , issuing therefor so-called bonds, shares, coupons, certificates of membership or other evidences of obligation or agreement" shall do any business in Wisconsin unless it shall have complied with the requirements of Chapter 215, Stats. We deemed it "manifest" that the association

"is to be licensed in Wisconsin under the statutes relating to building and loan associations, and is not to be licensed under the statutes relating to the doing of a banking business. *Consequently, the mere soliciting and receiving of payments by an investment association, licensed,*—as is the plaintiff association,—*under sec. 216.01 and ch. 215, Stats.,* and its issuance therefor of written evidence of obligation or agreement,—to return to the owners thereof money or anything of value, *are to be considered to be within the legitimate scope of the authorized business of such an investment company, as recognized by sec. 216.01, Stats., and are not to be deemed the doing of prohibited banking business.* (Emphasis supplied.) *Id.* at 143–44.

Similarly, we conclude the prohibition of secs. 224.02 and and 224.03 against the acceptance of money on deposit presents no bar to Mutual's offering Supreme Account II.

Sec. 215.13 (1), Stats., expressly permits savings and loan associations to "[a]ccept payments on savings accounts," and, as we have already stated, a Supreme Account II is such a savings account. Thus the depository relationship to which the plaintiffs object, Mutual's accepting payments on a Supreme Account II, is 'to be considered to be within the legitimate scope of the authorized business" of a savings and loan association, and is "not to be deemed the doing of prohibited banking business." *State ex rel. Rohn S. Mfg. Co. v. Industrial Comm.,* *supra* at 143–44. The legality of the Supreme Account II

must be determined with reference to the provisions of Chapter 215.

## IV.

Sec. 215.13(4), Stats., provides that savings and loan associations may "[p]ay withdrawal requests of savings accounts, in part or in full, in accordance with s. 215.17." Sec. 215.17(1) permits associations to pay withdrawals on its savings accounts and provides that the association "may pay to the owners of such savings accounts the withdrawal value thereof." The statutes further provide that the association "shall . . . [p]ay the saver" upon receipt of the written withdrawal requests, sec. 215.17(4) (a), and that "the saver shall be paid" the withdrawal request, sec. 215.17(4)(c). The plaintiffs contend Mutual's use of sight drafts to effect withdrawals from Supreme Account II constitutes the payment of withdrawals to third persons, in violation of these statutory mandates.

The court of appeals rejected this argument holding that "the legislature's provision that savings and loan depositor withdrawals be paid to the saver or owner is expressly complied with when a depositor's draft, made payable to a third person, is honored by the savings and loan association upon which the draft is drawn." *Wisconsin Bankers Asso. v. Mutual Savings & Loan Asso.*, 87 Wis.2d at 502–03. Although the court found sec. 215.17, Stats., "unambiguous," *Id.* at 493, the section was found to require construction and interpretation. The court of appeals concluded that the section's provisions that withdrawals be paid "to the owner" and "[to] the saver" do not restrict payments to a third party in light of the commercial and legal history of the "pay to" phrase, the nature of the depositor-association relation-

ship, and an articulated "legislative policy in favor of business competition." *Id.* at 498. We find this conclusion and reasoning incorrect.

In the absence of ambiguity in a statute, resort to judicial rules of interpretation and construction is not permitted, and the words of the statute must be given their obvious and ordinary meaning. *State ex rel. Milwaukee County v. WCCJ,* 73 Wis.2d 237, 241, 243 N.W.2d 485 (1976) ; *Schoolway Transportation Co. v. Division of Motor Vehicles,* 72 Wis.2d 223, 228, 240 N.W.2d 403 (1976). A statute, phrase, or word is ambiguous when capable of being interpreted by reasonably well-informed persons in either of two or more senses. *In re Estate of Haese,* 80 Wis.2d 285, 292, 259 N.W.2d 54 (1977). The plaintiffs assert the ordinary meaning of the phrases "pay to the owner" and "pay the saver" preclude payment to third parties; Mutual's argument, accepted by the court of appeals, is that the phrase "pay to" has long possessed a meaning in commercial law[2] which allowed the transferability of an instrument bearing the phrase and that the statutes' use of "pay to" does not require payment exclusively to the account owner. We conclude the phrase is ambiguous.

When a statute or part thereof is ambiguous, it is permissible to look to the legislative intent which is to be found in the language of the statute in relation to the statute's context, scope, history, subject matter, and object intended to be accomplished. *Wisconsin's Environmental Decade v. Public Service Comm.,* 81 Wis.2d 344, 350, 260 N.W.2d 712 (1978). This precept in mind, we

---

[2] Sec. 990.01(1), Stats., provides: "All words and phrases shall be construed according to common and approved usage; but technical words and phrases and others that have a peculiar meaning in the law shall be construed according to such meaning."

conclude the use of negotiable sight drafts to effectuate withdrawals from Supreme Account II contravenes the provisions of sec. 215.17, Stats.

We start with the proposition that the power of savings and loan associations to pay withdrawals is governed by sec. 215.13(4), Stats., which incorporates sec. 215.17. Chapter 215 is a comprehensive enactment, regulatory in nature. As such, its provisions are to be given expansive application, supplanting, rather than preserving, previously existing common law practices.

"Modern regulatory legislation, moreover, is generally regarded as a newly conceived system of legal arrangements to deal with newly emergent problems in society, entitled to liberal construction because of its remedial character and not subject to the rule of strict construction of statutes in derogation of the common law because its genesis and conception are wholly outside and apart from any common law frame of reference."

*Security Savings & Loan Asso. v. Wauwatosa Colony*, 71 Wis.2d 174, 179, 237 N.W.2d 729 (1976), *quoting* 3 Sands, *Statutes and Statutory Construction*, sec. 61.03 (4th ed. 1974). Thus withdrawals must be paid in accordance with sec. 215.17, notwithstanding any common law right to establish means of withdrawal by private contract.

Several factors persuade us that the plaintiffs' position must be accepted. First, we disagree with the court of appeals' conclusion that the historical definition of "pay to," as used in commercial instruments, is of relevance in ascertaining the legislature's intent in using that phrase where used in a statute governing withdrawals of savings accounts. We deem it more likely that the ordinary meaning of this phrase was intended. Mutual's argument, if accepted, satisfies only the requirement of

sec. 215.17(1), Stats., that associations "pay to the owners"; the commercial definition of "pay to" is of less assistance in meeting the requirements that the association "[p]ay the saver" and that "the saver shall be paid." Sec. 215.17(4)(a) and (c). The ordinary meaning of the words employed dictates the conclusion that the provisions of sec. 215.17 are not complied with when a depositor's draft, made payable to a third person, is honored by the savings and loan associations upon which the draft is drawn.[3]

Second, we reject the court of appeals' analogy to the principle favoring the assignability of choses in action. Initially, we note the court expressly disavowed any direct application of the principle of assignability. *Wisconsin Bankers Asso. v. Mutual Savings & Loan Asso.*, *supra* at 494 n. 17. However, the court of appeals referred to the principle as exemplifying a trend of increasing commercial flexibility, shared by both the legislature and courts, and found Mutual's utilization of the sight draft to be consistent with the trend. *Id.* at 495. The existence of the trend indicated to the court of appeals that sec. 215.17, Stats., should not be construed to proscribe sight drafts in the absence of language strict-

---

[3] In its decision, the court of appeals stated that various other withdrawal practices employed by Mutual were distinguishable from Supreme Account II as each involved "the direct participation and superintendence of the . . . depositor" in the transaction in which the withdrawal was requested and paid. *Wisconsin Bankers Asso. v. Mutual Savings & Loan Asso.*, 87 Wis.2d 470, 490, 275 N.W.2d 130 (Ct. App. 1978). The plaintiffs have not challenged this statement; indeed, they maintain "that none of these practices were payments to persons other than the account owner, and that they thus complied with the 'pay to the owner' requirement of sec. 215.17." Appellants' Supplemental Brief at 16. Because the court of appeals' statement was not challenged and was not necessary to that court's decision, we do not consider its correctness.

ly requiring such an interpretation. *Id.* This, in essence, is a variant of the derogation rule. "The maxim of construction is familiar, that a statute to abrogate or change any rule or principle of the common law, must be clearly expressed so as to leave no doubt of the intention of the legislature." *Orton v. Noonan and McNab,* 29 Wis. 541, 545 (1872). *See also:* Page, *Statutes in Derogation of Common Law: The Canon as an Analytical Tool,* 1956 Wis. L. Rev. 78. For the rule to apply, (1) there must be a common law doctrine in existence, or potentially in existence, relevant to the issue presented by the parties; (2) the statute in issue must be one which, construed as the party pleading it contended, would operate to change the common law; and (3) the statute must be ambiguous on its face. These three shown, a court was then warranted in proceeding to interpret the statute narrowly, to have as little effect as possible in altering the common law. *Id.* at 97. In the case at bar, the common law trend favoring the assignability of choses in action is relevant only to the extent the relationship between association and depositor can be characterized as debtor-creditor. Case law[4] and our own statutes[5] indicate that this may not be appropriate. More important, sec. 215.17 is not susceptible to construction in light of the derogation rule. As the court of appeals correctly recognized, the section is regulatory in nature. *Wisconsin Bankers Asso. v. Mutual Savings & Loan Asso., supra* at 498–99. As such, it is entitled to a liberal construction and is not to be construed narrowly as in derogation of common law rules. *Ante* at 10. We conclude the court of appeals' reliance on "a continually growing flexibility in the relations between financial institutions and their depositors respect-

---

[4] *See: Wisconsin Bankers Association v. Robertson,* 190 F. Supp. 90, 93 (D.D.C. 1960), *aff'd.* 294 F.2d 714 (D.C. Cir. 1961).

[5] *See, e.g.:* Secs. 215.17(3)(b) and 215.32(12)(c), Stats.

ing . . . choses in action" to be error. *Wisconsin Bankers Asso. v. Mutual Savings & Loan Asso., supra* at 493.

Similarly, we reject the court of appeals' reliance on the "declaration of legislative policy in favor of business competition . . . found in sec. 133.01, Stats." *Id.* at 498, 502. While statutes in pari materia may be construed together and compared with each other in order to ascertain the legislative intent, *In Matter of Estate of Walker*, 75 Wis.2d 93, 102, 248 N.W.2d 410 (1977), statutes which have no common aim or purpose and which do not relate to the same subject, thing, or person are not in pari materia. The antitrust statute, sec. 133.01, and sec. 215.17, Stats., are not *in pari materia.*

The court of appeals, in its consideration of a perceived legislative policy in favor of business competition and the trend toward flexibility in the relationship of financial institutions to their depositors, ignored traditional restraints on the judiciary's assessment of policy to aid in the construction of legislative enactments. As aptly stated by the court of appeals, "the function of this court is to apply and interpret the statutes enacted by the legislature and not engage in an *ad hoc* economic construction that substitutes the judgment of the court for the act of the legislature." *Wisconsin Bankers Asso. v. Mutual Savings & Loan Asso., supra* at 500. While legislative choice, as expressed in sec. 215.17, Stats., may indeed be unduly restrictive and retrogressive, statutory barriers to the continued expansion of commercial practices must be removed by the legislature. Accordingly, we are compelled to reverse. We hold that the provisions of sec. 215.17 preclude the use of sight drafts payable to third parties to effectuate withdrawals from savings accounts.

On appellate review, plaintiffs have sought "a declaration from the court that Supreme [Account] II is illegal." Appellants' Brief at 38. Accordingly, the action is akin to one requesting declaratory relief. Thus we declare Supreme Account II illegal as inconsistent with the provisions of sec. 215.17, Stats.

*By the Court.*—Rights declared; the decision of the Court of Appeals is reversed and cause remanded to the Circuit Court for further proceedings not inconsistent with this opinion.

COFFEY, J., took no part.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). After holding that the Supreme Account II is a valid savings account within the meaning of sec. 215.13(1), Stats., and that the Supreme Account II does not constitute the illegal conduct of banking business under chapter 224, the majority surprisingly concludes that the Supreme Account II violates sec. 215.17. I dissent because the majority's interpretation of sec. 215.17 is unduly restrictive. In holding that the phrase "pay to the owners" in sec. 215.17 prohibits savings and loans from paying withdrawals to third parties, the majority has ignored the purposes of chapter 215 and past decisions of this court regarding the interpretation of chapter 215. I conclude, as did the court of appeals, that the obligation of a savings and loan to "pay to the owners" or "pay the saver" is satisfied when the savings and loan honors the depositor's draft made payable to a third person.

Historically, it has been the commercial practice of savings and loan associations to satisfy their payment obligations to a depositor by paying to the depositor or to someone else at the depositor's direction. A depositor traditionally has had a variety of means for obtaining

withdrawals. Besides receiving cash or a check payable to the depositor, the depositor has been able to receive an accommodation check payable to a third party or a money order payable to a third party.

If the legislature had intended to prohibit savings and loans from payment of sight drafts, it could have used much more explicit language to express this prohibition. The legislature would not have left the prohibition to be inferred from the phrase "pay to the owner," when it knew how to frame a statute explicitly prohibiting sight drafts, as evidence by the following two statutes:

"[Trust company banks] . . . shall not receive deposits subject to draft, order or check payable on demand . . . ." Sec. 223.03 (11), Stats.

"[Mutual savings banks] shall not pay any dividend or deposit, or portion of a deposit, or any check drawn upon it by the depositor, unless the passbook of the depositor be produced and a proper entry be made therein at the time of the payment." Sec. 222.12 (4), Stats.

The majority recognizes that it is plausible to interpret the statutory language as satisfied when a savings and loan pays to a third person at the request of the depositor, but it nevertheless rejects this interpretation. Its reasons, however, are entirely unpersuasive.

The majority (p. 10), relying on the opinion written by Justice Connor T. Hansen in *Security Savings & Loan Asso. v. Wauwatosa Colony Inc.*, 71 Wis.2d 174, 179, 237 N.W.2d 729 (1975), states that chapter 215 is regulatory and its provisions "are to be given expansive application" (p. 10), and are "entitled to a liberal construction." (p. 12). I find the majority's repeated emphasis on the *Security Savings* language misleading for several reasons. First, Justice Hansen's opinion in *Security Savings & Loan*, relating to construction of ch. 215, was the opinion of only three justices; four justices did not join this opinion. The precedential value of a "majority"

opinion joined by only three justices is dubious. Second, the significance of the language from the *Security Savings & Loan* opinion quoted by the majority on page 10 is unclear. The court of appeals, the majority opinion and the parties take different views of the application of this language to the instant case. The majority opinion never tells the reader how to give an expansive application to or a liberal construction to chapter 215, and specifically sec. 215.17, and how the meaning of sec. 215.17 which results from an "expansive application" or "liberal construction" compares to the meaning of sec. 215.17 which results from a "strict," "narrow," or "non-expansive application." And after carefully explaining that chapter 215 must be given an expansive application and a liberal construction, the majority narrowly limits and narrowly construes the words "pay to." Third, it is clear, when you read Justice Hansen's opinion in *Security Savings & Loan* that Justice Hansen concludes, after discussing statutes in derogation of the common law, regulatory statutes, and broad and strict construction of statutes, that the "normal rules of statutory construction are applicable" to chapter 215. 71 Wis.2d at 179. Justice Hansen clearly states that the aim of statutory construction of chapter 215 is the same as the aim of all statutory construction, namely to discern the intent of the legislature as " 'disclosed by the language of the statute in relation to its scope, history, context, subject matter and the object intended to be remedied or accomplished.' " 71 Wis.2d at 180. We quote the full passage of Justice Hansen's opinion setting forth the applicable rule of statutory construction to chapter 215:

"This type of association existed at common law and possessed common-laws rights. *De Fazio v. Haven Savings and Loan Association* (1956), 22 N.J. 511, 126 Atl. 2d 639. Therefore, it must be resolved whether the stat-

ute is subject to the strict construction applicable to statutes in derogation of common-law rights.

"Generally, statutes restraining the freedom of contract have been considered subject to these rules. 82 C.J.S., *Statutes,* p. 942, sec. 393. However, comprehensive legislation dealing with these associations, having common-law rights, is regulatory, placing limits on those rights, rather than enabling, or conferring power or authority on the association. *Julien v. Model B., L. & I. Asso.* (1902), 116 Wis. 79, 89, 90, 92 N.W. 561. In this context, the rule of strict construction has its limits:

" '. . . An exception to the rule of strict construction is customarily made in the case of a statute which purports to provide a complete system of law covering all aspects of the subject with which it deals, so as to supersede all prior law on the subject, whether common or statutory law . . . .

" ' . . .

" '. . . Modern regulatory legislation, moreover, is genally regarded as a newly conceived system of legal arrangements to deal with newly emergent problems in society, entitled to liberal construction because of its remedial character and not subject to the rule of strict construction of statutes in derogation of the common law because its genesis and conception are wholly outside and apart from any common law frame of reference . . .' Sutherland, Statutory Construction (4th ed., 1974), *Statutes in Derogation of the Common Law: Limitations on the Rule,* pp. 51, 52, sec. 61.03.

"The law of this state is in accord with this proposition. *Heiden v. Milwaukee* (1937), 226 Wis. 92, 100, 101, 275 N.W. 922; and *Schumacher v. Milwaukee* (1932), 209 Wis. 43, 46, 243 N.W. 756. Therefore, normal rules of statutory construction are applicable to the instant provision."

" . . .

"We are of the opinion this statutory provision is ambiguous in that it is 'capable of being understood by reasonably well-informed persons in either of two or more senses.'

"In *Ortman v. Jensen & Johnson, Inc.* (1975), 66 Wis. 2d 508, 520, 225 N.W.2d 635, it was stated:

"This court has held that where a statute is ambiguous, this court must ascertain the legislative intention as disclosed by the language of the statute in relation to its scope, history, context, subject matter and the object intended to be remedied or accomplished. *Wisconsin Southern Gas Co. v. Public Service Comm.* (1973), 57 Wis.2d 643, 205 N.W.2d 403. The object to be accomplished by a statute must be given great weight in determining legislative intent. *Town of Menominee v. Skubitz* (1972), 53 Wis.2d 430, 192 N.W.2d 887. . . ."

"The considerations mandated by *Ortman, supra,* necessitate review of the various policy arguments. . . ."

*Security Savings & Loan, supra,* 71 Wis.2d at 178, 179, 180.

In interpreting sec. 215.17, this court must apply the ordinary rules of statutory interpretation to ascertain legislative intent.

Although the majority concludes that the phrase "pay to" is ambiguous, it concludes that commercial practice and the common law are irrelevant in ascertaining the meaning of the phrase or the legislative intent. Thus the majority refuses to accept what it concludes to be the common law and commercial practice that an obligation to "pay to the owner" can be satisfied by payment to a third person.

I find the majority's unwillingness to look at commercial practice contrary to the general rules of statutory construction and contrary to good common sense. When the legislature drafted chapter 215, codifying major guidelines for Wisconsin's savings and loan industry, it was not legislating on an empty slate or with an empty head. Chapter 215 was developed with full knowledge by the legislature of established commercial practices, the history of the savings and loan industry and existing judicial precedent.

Although the majority states that the common, ordinary meaning of the word "pay" should apply, not the

commercial meaning of the word "pay," the opinion nowhere states the word's ordinary meaning. The dictionary defines "pay" to mean "discharge an obligation to," or "to make any agreed disposal or transfer of money." Webster's Third New International Dictionary p. 1659 (1961). This court has accepted the following as the common ordinary meaning of the word "pay":

" 'Pay' is a word of quite comprehensive meaning, but we agree . . . it was evidently intended to have its ordinary meaning which is to discharge the indebtedness by the use of money." *Krahn v. Goodrich,* 164 Wis. 600, 610, 160 N.W. 1072, 1075 (1917).

The word "pay," in its common, ordinary meaning, does not restrict transfer to the saver or depositor. Thus, both the commercial meaning of "pay" and the common meaning of "pay" allow a savings and loan to discharge its payment obligation to the owner by transfer to a third person. Under both its commercial and ordinary meanings, "pay to the owner" addresses the legal obligation of the institution to return deposited funds to the depositor but does not touch upon the manner of discharging this obligation. Therefore, to read sec. 215.17 to prohibit payment to third persons is to rewrite the statute contrary to both well-established commercial practice and ordinary usage of the terms.

A more fundamental objection to the majority's opinion, however, is that in its preoccupation with the rule that regulatory statutes are to be liberally construed and be given expansive application, the majority has missed the goal of determining the legislative intent of chapter 215.

Chapter 215 was designed to provide a broad framework of powers for savings and loan associations. Chapter 215 was not intended to be a detailed procedural manual for all the day-to-day operations of savings and loan associations. While some matters are regulated in de-

tail, others are couched in general terms, leaving room for savings and loans to adopt methods of operation to carry them out. The obligation of a savings and loan association to "pay to the owner" is a provision of the latter type. Sec. 215.17 places a payment obligation on the savings and loan association without prescribing the manner in which the obligation is to be discharged.

And if the generality of provisions such as the one at issue in the instant case is inadequate to make it clear that savings and loan associations were given wide latitude to adopt procedures, that point is made clear by the "omnibus powers" provision in sec. 215.13(37), Stats. That section permits savings and loan associations to exercise "all powers necessary and proper to carry out the purposes of the association."

In April of 1976 Mutual Savings and Loan Association advised the Wisconsin Commissioner of Savings and Loans that it was implementing the Supreme Account II. The Commissioner replied to Mutual's inquiry regarding legal support as follows:

"A withdrawal order directing payment to a third party is not new; account holders have long been able to direct that withdrawals be paid to designated third parties. Although the statutes governing savings accounts go into great detail spelling out when and in what sequence withdrawal orders may be honored, neither the statutes nor existing administrative rules restrict the form that a withdrawal order may take. In the absence of any prohibition against the form of withdrawal you have proposed, I am not in a position to object to withdrawals being made by negotiable orders; it is my opinion that withdrawals of this kind are permitted under current Wisconsin law."

While the court of appeals in this case quoted the Commissioner's letter approvingly, it felt it could accord no deference to the Commissioner's construction because the statute was unambiguous. The majority of this court

has now held that the statutory language is ambiguous. The majority gives no reasons, however, for not according deference to the interpretation of the statute by the Commissioner of Savings and Loans, the official with expertise in administering chapter 215.

The statutory purposes of savings and loans are two-fold: to promote thrift and to provide management for the funds of the members and at the same time to provide funds for borrowers, especially mortgage money for home ownership. *Security Savings & Loan,* 71 Wis.2d at 183. Since innovative services like the payment of sight drafts attract savings dollars, which are then used to provide home loans, the payment of sight drafts does carry out the purposes of savings and loan institutions.

The majority believes sec. 215.17 was intended to restrict the method of payment, but nowhere in its opinion does it deal with the purpose intended to be accomplished by such a restriction. Nor does the majority deal explicitly with the scope or context or history or subject matter of chapter 215. The majority has short-circuited the analysis required in this case by the simple analysis that the word "pay" as used in sec. 215.17 is ambiguous, that chapter 215 is a regulatory scheme, and that therefore the legislative intent behind sec. 215.17 must be to restrict method of payment. The position taken by the majority is contrary to precedent and the rules of statutory construction. Absent a specific statutory prohibition, sec. 215.17 should be interpreted to allow savings and loan associations to honor requests for payments to third parties. Such an interpretation is consistent with commercial practice, with common law, with the objectives of chapter 215 and with sec. 215.13(37), Stats., which authorizes associations to exercise all powers necessary and proper to carry out the purposes of the association. I dissent.

I am authorized to state that Justice Roland B. Day joins in this dissent.