SUSSEX TOOL & SUPPLY, INC., Plaintiff-Appellant-Cross-Respondent,

v.

MAINLINE SEWER AND WATER, INC., Defendant-Respondent-Cross-Appellant-Additional-Appellant,

VILLAGE OF LANNON, Defendant,

TRANSCONTINENTAL INSURANCE COMPANY, Defendant-Additional-Respondent.

Court of Appeals

*No. 98–2649. Submitted on briefs September 14, 1999.—Decided November 10, 1999.*

(Also reported in 605 N.W.2d 620.)

404

On behalf of the plaintiff-appellant-cross-respondent, the cause was submitted on the briefs of *Cynthia M. Mack* of *Lichtsinn & Haensel, S.C.* of Milwaukee.

On behalf of the defendant-respondent-cross-appellant-additional-appellant, the cause was submitted on the briefs *W. Wayne Siesennop* and *Mary Susan Maloney* of *Hannan, Siesennop & Sullivan* of Milwaukee.

On behalf of the defendant-additional-respondent, the cause was submitted on the brief of *William P. Croke* of *Quale, Feldbruegge, Calvelli, Thom & Croke, S.C.* of Milwaukee.

There was a nonparty brief filed by *Donald J. Murn* and *Michelle E. Martin* of *Murn Law Offices* of Waukesha for Wisconsin Underground Contractors' Ass'n.

There was a nonparty brief filed by *Charles V. Sweeney, Raymond P. Taffora* and *Nia Enemuoh-Trammell* of *Michael Best & Friedrich LLP* of Madison for Wisconsin Transportation Builders Ass'n.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1. BROWN, P.J. In this case we decide whether a small business whose profits allegedly suffered due to decreased road accessibility during sewer construction may maintain a suit against the contractor for breach of contract and negligence. First, we conclude that the business does not have standing as a third-party beneficiary of the construction contract. The construction contract, like all municipal public works contracts, was made for the benefit of the public as a whole. Therefore, absent contractual language indicating otherwise, an individual member of the public is not entitled to damages for breach. Second, we decide that public policy bars the business's negligence claim. To allow area businesses to recover lost profits from the contractor would open a field of liability with no just or sensible stopping point. We affirm.

¶ 2. The facts are as follows. The Village of Lannon hired Mainline Sewer and Water, Inc. (Mainline) to install a sewer and water system. Under the terms of the contract, Mainline promised to: "provide vehicular access at all times to the properties affected by this project"; maintain one-way access during working hours and two-way access at all other times except as noted in specific permits; and "supply all necessary signs, flagmen and lights required according to the 'MANUAL ON UNIFORM TRAFFIC CONTROL DEVICES.' " Sussex Tool & Supply, Inc. (Sussex) claims that Mainline failed to maintain access as promised and because of this it lost profits during the construction project.

¶ 3. Seeking to recover its lost profits, Sussex brought this action against Mainline and the Village. As to the Village, Sussex alleged negligence and statu-

407

tory liability for failure to keep the road in repair. As to Mainline, Sussex alleged negligence and breach of contract. The Village cross-claimed against Mainline and its insurer, Transcontinental Insurance Company, for indemnification. All three defendants moved for summary judgment. Transcontinental claimed Sussex's business losses were not covered under its policy with Mainline. The Village denied any liability toward Sussex, reasoning that its acts were discretionary in nature. If Sussex's claim against it survived, the Village argued, the construction contract required indemnification from Mainline and Transcontinental. Mainline contended that Sussex's consequential damages were not of the sort recoverable and, even if they were, Mainline was shielded from liability by the Village's governmental immunity. The trial court granted the Village's motion against Sussex in its entirety, thus mooting the Village's cross-claims against Mainline and Transcontinental. Citing *Sheeley v. Chippewa County*, 217 Wis. 41, 258 N.W. 373 (1935), the trial court granted Mainline summary judgment against Sussex, ruling that Sussex could not sue for breach of a municipal contract in the absence of a statute extending it that right. This mooted Transcontinental's coverage claim. Sussex appeals only the dismissal of its action against Mainline.[1]

---

[1] Mainline argues on cross-appeal that it is entitled to governmental immunity or, alternatively, that it was acting as a governmental agent but did not receive the notice required by §§ 893.80 and 893.82, STATS. Additionally, Mainline appeals from the trial court's decision that there is no coverage for Sussex's claims under Mainline's policy with Transcontinental. Our decision regarding Sussex's claims against Mainline renders these arguments moot. *See Diamond v. Ruszkiewicz*, 212 Wis. 2d 143, 149, 567 N.W.2d 649, 652 (Ct. App. 1997). Furthermore,

¶ 4. We first address Sussex's standing to maintain its breach of contract claim.[2] The general rule is that only a party to a contract may enforce it. *See Schilling v. Employers Mut. Cas. Co.*, 212 Wis. 2d 878, 886, 569 N.W.2d 776, 780 (Ct. App. 1997). However, there is an exception when the contract was made specifically for the benefit of a third party. *See id.* The person claiming third-party beneficiary status must show that the contracting parties entered into the agreement for the direct and primary benefit of the third party, either specifically or as a member of a class intended to benefit from the contract. *See id.* at 886–87, 569 N.W.2d at 780. An indirect benefit incidental to the primary purpose of the contract is insufficient to confer third-party beneficiary status. *See id.* at 887, 569 N.W.2d at 780.

¶ 5. In *Schilling*, the court ruled that a student injured in shop class was not a third-party beneficiary under the employment contract between the shop teacher and the school district. *See id.* at 881, 569 N.W.2d at 778. The student argued that by referring to "rules, regulations and policies of the district," the con-

because we affirm on other grounds, we do not discuss our disagreement with the trial court's reliance on *Sheeley v. Chippewa County*, 217 Wis. 41, 258 N.W. 373 (1935).

[2] Sussex argues in its reply brief that Mainline waived the third-party beneficiary standing issue by failing to raise it before the trial court. However, both standing—which is the basis of our holding on the contract claim—and waiver are rules of judicial policy rather than jurisdictional prerequisites. *See Wisconsin Bankers Ass'n v. Mutual Sav. & Loan Ass'n*, 96 Wis. 2d 438, 444 n.1, 291 N.W.2d 869, 873 (1980) (standing is a matter of sound judicial policy); *Wirth v. Ehly*, 93 Wis. 2d 433, 443–44, 287 N.W.2d 140, 145–46 (1980) (waiver is rule of judicial administration). We choose to address the issue.

tract incorporated the faculty handbook and safety rules. *See id.* at 887–88, 569 N.W.2d at 780–81. Under the student's theory, the incorporation of documents setting forth safety measures evidenced an intent to benefit students. The court disagreed. While students are certainly incidental beneficiaries of teacher employment contracts, since the job of the teacher is to educate students, "this does not satisfy the burden of showing that this teacher and this school board entered into this contract primarily and directly for the benefit of students." *Id.* at 890, 569 N.W.2d at 781. Thus, the student could not maintain a claim against the teacher for breach of the employment contract. *See id.* at 894, 569 N.W.2d at 783.

¶ 6.   In contrast, the court held that the plaintiff in *State ex rel. Journal / Sentinel, Inc. v. Pleva,* 151 Wis. 2d 608, 445 N.W.2d 689 (Ct. App. 1989), *aff'd,* 155 Wis. 2d 704, 456 N.W.2d 359 (1990), did have standing to sue as a third-party beneficiary. There, Milwaukee World Festival, Inc. (Festival) leased the Milwaukee lakefront from the city of Milwaukee. The lease expressly required that Festival hold meetings in accord with Wisconsin's Open Meetings Law, §§ 19.81 to 19.98, STATS. While the trial court found this provision only incidental to the basic purpose of leasing the land, this court held that the provision "evidences a primary purpose of protecting the public interests it affects." *Pleva,* 151 Wis. 2d at 616, 445 N.W.2d at 692. Thus, representative members of the public had standing to sue under the lease. *See id.* at 617, 445 N.W.2d at 692–93.

¶ 7.   Sussex could argue that this is a *Pleva* case, likening the road access clause in the sewer contract to the open meetings requirement in the *Pleva* lease. Both arguably evidence "a primary purpose of protecting the

410

public interests." *Id.* at 616, 445 N.W.2d at 692. It would make sense for the Village representatives to consider the interests of local businesses when negotiating the sewer contract as it is in the representatives' best interest to promote local commerce and thus ensure a high tax base. But, the remedy Sussex seeks underscores the difference between *Pleva* and the present case. In *Pleva*, the newspaper sought specific performance of the lease; that is, its action was to force Festival to open its meetings. Here, Sussex seeks economic damages resulting from the alleged breach. Sussex seeks to be made whole as an individual, whereas the plaintiffs in *Pleva* sought to enforce a clause that would benefit all members of the public. Furthermore, as we discuss below, had the Village meant the contract to allocate the risk of economic damage to local businesses, it should have included contractual language to that effect. In short, this is not a *Pleva* case.

¶ 8. What makes Sussex's claim that it is a third-party beneficiary of the construction contract problematic is that the primary purpose of any public works contract is the benefit of the public. This characteristic has led courts and codifiers to fashion a more restrictive test to determine third-party rights in public contracts. *See* Robert S. Adelson, *Third Party Beneficiary and Implied Right of Action Analysis: The Fiction of One Governmental Intent*, 94 YALE L.J. 875, 878–79 (1985). The RESTATEMENT recognizes this by specifically addressing third-party beneficiary status under government contracts. *See* RESTATEMENT (SECOND) OF CONTRACTS § 313 (1981) [hereinafter RESTATEMENT]. The RESTATEMENT provides that:

411

(2) [A] promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless

    (a)     the terms of the promise provide for such liability; or

    (b)     the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract . . . .

*Id.* Comment a explains the rationale behind the rule:

Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested. In case of doubt, a promise to do an act for or render a service to the public does not have the effect of a promise to pay consequential damages to individual members of the public unless the conditions of Subsection (2)(b) are met.

Thus, unless the municipality would be liable to the individual member of the public for nonperformance, the contractor will not be liable. The RESTATEMENT provides an illustration of this principle.

A, a municipality, owes a duty to the public to keep its streets in repair. B, a street railway company, contracts to keep a portion of these streets in repair but fails to do so. C, a member of the public, is injured thereby. He may bring actions against A and B and can recover judgment against each of them.

*Id.* illus. 5.

¶ 9.    At first blush, this illustration seems to be on all fours with the present case. But a second glance at the illustration, coupled with a review of cases discussing the RESTATEMENT rule, reveals three distinguishing factors. First, the construction company in the case sub judice did not contract to undertake an ongoing municipal duty. Second, in cases where the contractor has been held liable, the contract contained language by which the contractor expressly assumed liability. Third, in those cases, the contract language confined third-party beneficiary status to a well-defined and limited group of third parties. A few examples suffice to demonstrate the difference between those cases and the present case.

¶ 10.    The reporter's note in the RESTATEMENT states that illustration five "was accepted but distinguished" in *Oman Construction Co. v. Tennessee Central Railway*, 370 S.W.2d 563 (Tenn. 1963). *See* RESTATEMENT § 313, reporter's note at 475. There, the railway sued two construction companies and an engineering consultant for damage to its depot. The damage occurred when a new sewer was installed. In relieving the engineer from liability, the court pointed out that the contract with the engineer contained no language by which the engineer assumed liability, while the contract with the construction company did. *See Oman*, 370 S.W.2d at 569. "Had it been the intention of the parties that [the engineer] be contractually liable to the plaintiff or others, it would have been a simple matter to have included . . . the same clear and unambiguous provisions for assumption of liability that were contained in [the construction contract] . . . ." *Id.*[3] The court concluded that, in his contract with the

[3] The liability assumption portion of the contract read:

413

city, the engineer, unlike the construction company, had assumed no ongoing duty that would give rise to liability for private parties' damages.

¶ 11.    Where the contractor has expressly promised to repair damage, the court will allow individuals to enforce the promise. For example, in *Plantation Pipe Line Co. v. 3-D Excavators, Inc.*, 287 S.E.2d 102 (Ga. Ct. App. 1981), the county contracted with 3-D for sewer improvements. During the project, 3-D damaged a pipeline owned by Plantation. Plantation sought recovery as a third-party beneficiary to the contract between 3-D and the county. The contract contained the following provision: "Any damage to existing structures or utilities shall be repaired or made good by the Contractor [defendant] at no expense to the Owner [DeKalb County]." *Id.* at 103 (alteration in original). The court held that this was not merely a promise to indemnify the county, but that it extended to "those individuals whose . . . utilities were in such proximity to the construction work . . . as to be reasonably afforded the contractual protection incorporated in the contract." *Id.* at 105. Thus, third-party beneficiary status could be confined to a limited and well-defined class, namely, those whose nearby structures or utili-

He [the contractor] shall be responsible for all damage or injury to property of any character resulting from any act, omission, neglect or misconduct in the manner or method of executing the work or due to his non-execution of the work or at any time due to defective work or materials . . . . When and where any direct or indirect damages or injury is done to public or private property on account of any act, omission, neglect or misconduct in the execution of the work . . . he shall restore, at his expense, such property to a condition similar or equal to that existing before such damage or injury was done . . . .

*Oman Constr. Co. v. Tennessee Cent. Ry.*, 370 S.W.2d 563, 566 (Tenn. 1963).

ties had been damaged. In sum, the contractual language was specific enough to overcome the RESTATEMENT rule that the contractor is not liable unless "the terms of the promise provide for such liability." RESTATEMENT § 313(2)(a).

¶ 12.   Contractual language was held to specify a well-defined class of third-party beneficiaries entitled to lost profits in *Just's, Inc. v. Arrington Construction Co.*, 583 P.2d 997 (Idaho 1978). There, a business in a local improvement tax district brought suit against the construction company that was renovating the district. The business claimed it had lost profits due to the construction company's failure to finish the project on time and to provide access to the business. In order for a third party to enforce a public works contract, the third party must show "he is a member of a limited class for whose benefit it was made." *Id.* at 999. In *Just's*, the fact that the business was in an area where taxes had been increased in order to fund the renovation distinguished the plaintiff's claim from one made by a member of the general public. *See id.* at 999–1000. Furthermore, the contract contained a specific promise that "[a]ccess to and from the Various businesses shall be continuously and courteously provided." *Id.* at 1000. Another term ensured that "disruption to the downtown businesses be as minimal as possible." *Id.* Taken together, the "provisions impose a contractual obligation on the defendant to take specific steps to prevent undue injury to a well defined and limited class of third parties." *Id.* at 1001. Because the contract evinced the parties' intent that the contractor take precautions to protect area businesses, the plaintiff was entitled to sue for lost profits as a third-party beneficiary.

¶ 13.    The class of intended beneficiaries to which Sussex claims to belong in our case is not so well defined. The Village/Mainline contract states that: " Contractor shall provide vehicular access at all times to the properties affected by this project unless otherwise authorized in writing by the Engineer." While this does circumscribe the number of possible third-party beneficiaries, albeit somewhat vaguely, it does not have the specificity required for the court to infer an intent to assume liability for damages. *Cf. Lundt v. Parsons Constr. Co.*, 150 N.W.2d 108, 110 (Neb. 1967) (quoting contract stating that "Contractor shall . . . protect . . . all buildings, walls, fences and other property along his line of work or affected directly by his work, against damage and shall repair or repay the injured owners for such damage"). Nor does the Village/Mainline contract specifically refer to business access like the contract in *Just's* did. *See Just's*, 583 P.2d at 1000. In short, the contractual language here does not demonstrate any intent to confer third-party beneficiary status on individual members of the public to sue for purely economic interests.

¶ 14.    We now address Sussex's tort claim. Sussex alleged that Mainline was negligent, claiming that Mainline "failed to provide sufficient detours, flagmen and signs to direct traffic" while the project was in progress and that this failure resulted in damages to Sussex.[4]

---

[4] In its response brief, Mainline argues that Sussex's tort claim should be barred by the economic loss doctrine. *See Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 400–06, 573 N.W.2d 842, 844–47 (1998) (discussing rationale behind economic loss doctrine). In *Daanen*, the supreme court explicitly left open the question of whether the economic loss

¶ 15. To constitute a cause of action for negligence there must exist: (1) a duty on the part of the defendant, (2) the breach of which, (3) causes, (4) damages. *See Coffey v. City of Milwaukee*, 74 Wis. 2d 526, 531, 247 N.W.2d 132, 135 (1976). However, even if all four elements are present, public policy considerations may preclude liability. *See Gould v. American Family Mut. Ins. Co.*, 198 Wis. 2d 450, 460, 543 N.W.2d 282, 286 (1996). "Whether public policy considerations should preclude liability in this instance is a question of law which we review *de novo*." *Id.* at 461, 543 N.W.2d at 286. The conditions that may lead to a denial of recovery are:

---

doctrine applies when the underlying contract is one for services rather than goods. *See id.* at 417, 573 N.W.2d at 851–52. One of the questions this court has is whether the facts before us relate to an alleged negligent provision of services as opposed to goods. Neither party has briefed this aspect of the issue. We therefore do not feel comfortable deciding whether the economic loss doctrine provides the answer to the negligence claim. Moreover, assuming arguendo that Mainline's work consisted of providing services rather than goods, deciding whether the economic loss doctrine applies would require us to make law. We are primarily an error-correcting court, not a law-declaring court. *See Cook v. Cook*, 208 Wis. 2d 166, 188, 560 N.W.2d 246, 255 (1997). While court of appeals decisions do make law in many instances, because we resolve the issue on public policy grounds, and because of the problematic nature of the briefing regarding the economic loss doctrine, we need not and do not wish to address the application of the economic loss doctrine. The Wisconsin Supreme Court is the appropriate body to decide if, under Wisconsin law, the economic loss doctrine applies to the negligent provision of services.

(1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

*Coffey*, 74 Wis. 2d at 541, 247 N.W.2d at 140. Finally, we decide whether public policy bars liability on a case-by-case basis. *See Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 650–51, 517 N.W.2d 432, 442 (1994).

¶ 16. Even assuming arguendo that Sussex has shown all the elements of a negligence claim, we conclude that public policy considerations bar liability in this case. First, even if Mainline did negligently fail to place detour signs, the potential liability for all area businesses' dips in profit is way out of proportion to the significance of the negligent act. Second, an allowance of recovery would saddle Mainline, and ultimately all municipalities since contractors would pass on the risk of liability to them, with unreasonable economic exposure. Third, such liability "has no sensible or just stopping point." *Coffey*, 74 Wis. 2d at 541, 247 N.W.2d at 140.

¶ 17. We agree with the rationale set forth by the *Just's* court when addressing the negligence claim in that case. *See Just's*, 583 P.2d at 1002–06. As discussed above, the plaintiff there sought lost profits due to a renovation project's interference with business access. The court distinguished the plaintiff's purely economic

damages from personal injuries and property damage, holding that to allow such compensation "would impose too heavy and unpredictable a burden on the defendant's conduct." *Id.* at 1005.

> This plaintiff is surely not the only person who may have suffered some pecuniary losses as a result of the downtown renovation project. For example, others who may have suffered pecuniary losses could conceivably include not only all the other businesses in the area, but also their suppliers, creditors, and so forth, Ad infinitum. In contrast to the recognized liability for personal injuries and property damage, with its inherent limitations of size, parties and time, liability for all the economic repercussions of a negligent act would be virtually open-ended. If the defendant's liability were extended to all those who suffered any pecuniary loss, its liability could become grossly disproportionate to its fault. Such potential liability would unduly burden any construction in a business area.

*Id.* (citation omitted). We agree. The sphere of liability in this case is not well defined. The imposition of liability for such nebulous consequences as Sussex's alleged decline in sales is not favored by public policy.

*By the Court.*—Judgments affirmed.