G. M. TRIPP, Appellant, v. NORTHWESTERN LIVE STOCK
INSURANCE COMPANY.

**Live Stock Insurance: Liability on Policy.** A policy insuring
against death by "disease or accident" does not cover a case where a
horse is killed on the advice of a veterinary sent by the company to
treat the horse, though the president directed assured to follow the
surgeon's directions as to treatment; the killing being done two hours
before the policy expired, not because the horse was in pain, but
because recovery was impossible, and procured by plaintiff in order to
enable him to make a claim under the policy.

**Power of President.** Where the policy does not cover stock intention-
ally killed, no action can be maintained on the policy for stock so
killed, though it was destroyed by direction of the president of the
company.

SAME. At all events, it will not be *presumed* that the president has the
power to impose such a liability on the company.

*Appeal from Jasper District Court.*—HON. D. RYAN,
Judge.

MONDAY, MAY 21, 1894.

ACTION at law, on a policy of insurance to recover
for the loss of a horse. After the evidence for the
plaintiff had been submitted, the court directed the jury
to return a verdict for the defendant, which was done.
From the judgment rendered on the verdict, the
plaintiff appeals.—*Affirmed.*

*Alanson Clark* and *E. J. Salmon* for appellant.

*Guernsey & Baily* and *H. S. Winslow* for appellee.

ROBINSON, J.—In April, 1890, the defendant issued
to the plaintiff a policy of insurance, which, by its
terms, was to terminate on the fourteenth day of April,
1891. The policy insured the plaintiff against loss
from death, caused by disease or accident, of a stallion

known as Bar Non, to an amount not exceeding five hundred dollars. Two hours before the expiration of the policy, the horse was intentionally killed. Plaintiff alleges that the horse was suffering from a disease from which he appeared to be recovering when insured; that serious illness was not apprehended until October, when the disease again appeared and continued until the death of the horse; that defendant sent one Ray, a veterinary surgeon, to treat the horse, with full power to do with him what seemed proper; that Ray became satisfied that the horse could not recover, and on the morning of the fourteenth day of April, 1891, as an act of mercy, and to relieve the horse from its suffering, directed that he be killed, and that in consequence of that direction he was killed, by shooting and the opening of a vein in his neck; that the vein was opened by Ray; and that, in all that he did, he acted for defendant. The defendant denies that the death of the horse was the result of disease or accident; denies that Ray was authorized by it to kill the horse; and avers that he was employed to treat, and, if possible, to cure, him. The defendant further alleges that plaintiff did not use the diligence and care for the preservation and safe-keeping of the horse required by the policy, and that he was killed for the purpose of attempting to impose upon the defendant a liability which was not created by the policy. The evidence shows that the horse, when insured, was suffering from the disease which he had when killed. He had been under treatment for it several months before that time, and plaintiff had written to defendant several letters in regard to the matter. On the fourth day of April, 1891, the plaintiff called on the secretary of defendant in Des Moines, and after some conversation, they called in Dr. Ray and had some conference with him in regard to the condition and treatment of the horse. At the close of the conference, the secretary said they would try to

send Ray out, to see if anything could be done for the horse. A few days later, Ray appeared at the residence of the plaintiff and said the defendant had sent him there to take charge of the horse. On the ninth day of April, Ray told the plaintiff that the horse was worthless, and never would be worth anything, and that he thought it would be best to kill him. The plaintiff said that he would not feel like doing that without first seeing the company, as it had insured the horse, and asked Ray if he would be willing to make a statement in writing. Ray said he would, and wrote and signed a statement, which we do not find in the record, but which, we understand, was to the effect that the horse was worthless, and could not recover and that it would be best to kill him. On the thirteenth day of April the plaintiff visited the president and secretary of defendant, in Des Moines, and conversed in regard to the horse. The plaintiff told the officers that the horse was in a bad condition, and that Ray had advised his destruction. The president said he doubted that, but finally told the plaintiff to go home, and follow Ray's directions. At that time, the plaintiff had in his pocket the statement signed by Ray, but did not disclose the fact. The plaintiff returned to his home and asked Ray further in regard to the horse. Ray said he was not worth a cent, and never would be; that the disease he had would certainly prove fatal; that he was liable to drop dead at any time, and would die within a few days at the furthest. Plaintiff asked him what he would advise, and he said he would take the horse out, and shoot him. Ray then turned to an employee of plaintiff, and told him to take the horse out, and shoot him; and he was taken out and shot by the employee and another, under the immediate direction of Ray, who also assisted by opening a vein. The horse was dead two hours before the expiration of the policy.

We have examined the entire record with much care, and reach the conclusion that the destruction of the horse was not authorized by the defendant; that it was not caused by disease or accident, within the meaning of the policy; and that it was brought about by the active and skillful management of the plaintiff, in order that he might make a claim under the policy. It is not shown that the horse was in pain, nor that his death was required as an act of mercy, to relieve his sufferings. It is possible, though not at all probable, that his death would have occurred during the life of the policy, had it not been hastened as stated. But it is certain that neither disease nor accident was the direct and immediate cause of the death. The defendant had undertaken to insure against loss from death which should result from either of those causes, and its liability for such loss was conditioned upon the exercise by the assured of "all diligence, precaution, and care in the use, and for the safety, health, and preservation, of said live stock," and "in case of sickness or accident," plaintiff agreed to "promptly summon to his aid the best veterinary surgeon to be had in the vicinity, or, if none can be had, to otherwise provide the best available care and attention," and he was required to notify the defendant, or its nearest agent, at once, of the fact of the sickness or accident. The policy also provided that its benefit should not extend to any fatal injury which occurred through the connivance, sufferance, or act of the plaintiff, his agent, or employee. The entire contract of insurance shows that it was not intended that the defendant should be liable for any willful act which tended to hasten the death of the horse insured, but that it should be relieved from liability by such act. When Ray was employed by the defendant to treat the horse, it was to preserve him, and to prolong his life; not to

take it. It must be accepted as true that the president of defendant told plaintiff to go home, and follow the advice of Ray, and that plaintiff did so; but we are satisfied that the president did not intend to authorize the creating of liability against the defendant by the killing of the horse, and that Ray did not intend to act for the company, in advising and assisting in the killing, but that what he said and did was in response to the inquiry, and for the benefit, of plaintiff. We are also satisfied that plaintiff knew that Ray was not assuming to act for the company when he advised the destruction of the horse, and assisted to accomplish it.

If it be conceded that the president and secretary of the company, or either of them, intended to authorize Ray to do what was done, their power to bind the defendant by doing so is not shown, and can not be presumed. The business of the defendant appears to have been to insure against loss which resulted from the death of live stock; not to destroy it, and then pay for its loss. The obligation which, it is said, the president attempted to create was of the latter kind, and, therefore, was not, so far as is shown, within the scope of his powers. See *Templin v. Railway Co.*, 73 Iowa, 552, 35 N. W. Rep. 634, and cases therein cited. The officers of defendant reached the limit of their authority when they had used every reasonable effort to preserve the life of the horse. If a liability was created by killing him, it was not one provided for by the policy, and an action thereon can not be maintained for the loss. The burden was upon the plaintiff to show that the disease from which the horse suffered was the cause of, and not merely a pretext for, his death during the life of the policy; and that he has wholly failed to show. We conclude that the district court rightly directed a verdict for the defendant, and its judgment is AFFIRMED.