637 P.2d 792

George C. JUKER, Plaintiff-Respondent,

v.

AMERICAN LIVESTOCK INSURANCE COMPANY, Defendant-Appellant.

No. 13280.

Supreme Court of Idaho.

March 3, 1981.

On Rehearing Nov. 23, 1981.

James C. Tucker, Nelson, Rosholt, Robertson, Walker, Tolman & Tucker, Twin Falls, for defendant-appellant.

Robert C. Weaver, Weaver & Dykas, Buhl, for plaintiff-respondent.

DONALDSON, Justice.

This is an appeal from a summary judgment in an action brought by plaintiff-respondent Juker against defendant-appellant American Livestock Insurance Company to establish liability on a livestock mortality policy issued to insure a racehorse. Summary judgment was granted in favor of respondent Juker. We reverse and remand with directions that summary judgment be granted in favor of appellant insurance company.

The insurance company issued the policy to insure against loss through death of the racehorse occurring while the policy was in force. Approximately twelve days before coverage under the policy expired, the racehorse sustained severe injury, a slab fracture of the left front knee. Approximately four days after expiration of the policy, Juker telephoned the insurance company and reported the injury. Subsequently, the insurance company, through telephone conversation and written correspondence, contacted the attending veterinarian who apprised the company of the horse's condition. Approximately 80 days after expiration of the policy, the veterinarian further corresponded with the insurance company specifically advising that the horse be euthanized for humane reasons.

The insurance company did not consent to the euthanasia but, rather, denied coverage for the expected loss of the racehorse primarily upon the basis that there had been

no loss through death during the policy period. Juker, in response, initiated proceedings in the district court seeking coverage. Summary judgment was directed in favor of Juker. The insurance company appeals.

■ In construing an insurance contract, the rule in Idaho is that intent is to be determined from the language of the contract itself and in the absence of ambiguity, the contract must be construed as any other and understood in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the contract. *Casey v. Highlands Insurance Co.,* 100 Idaho 505, 600 P.2d 1387 (1979); *Corgatelli v. Globe Life & Accident Insurance Co.,* 96 Idaho 616, 533 P.2d 737 (1975) (Donaldson, J., dissenting opinion).

The insurance contract in the instant case clearly provides insurance against loss through death of the racehorse occurring while the policy is in force, resulting from natural causes or illness or disease or accident, subject, however, to the pertinent exclusion that there is no coverage for intentional slaughter of the insured animal unless with the consent of the insurance company. Review of the record discloses that there was no loss through death during the policy period, either through intentional slaughter or otherwise.

■ The policy plainly and unambiguously sets forth its terms of coverage and its termination date. No extension of policy period is provided. The plain wording of the policy controls. There has been no covered loss during the policy period; there can be no recovery. *Casey v. Highlands Insurance Co., supra; Leach v. Eureka Life Insurance Co.,* 580 S.W.2d 628 (Tex.Civ.App. 1979); *Underwriters at Lloyds, London v. Harkins,* 427 S.W.2d 659 (Tex.Civ.App. 1968).

■ Accordingly, we reverse the order of the district court and remand with directions that summary judgment be entered in favor of defendant-appellant American Livestock Insurance Company. Although appellant made no motion for summary judgment, where one party moves for summary judgment and the other is entitled to it, the court may grant summary judgment in favor of the non-moving party. *Just's, Inc. v. Arrington Construction Company, Inc.,* 99 Idaho 462, 476, 583 P.2d 997, 1011 (1978) (on denial of petition for rehearing). Appellant did assert the defense of failure to state a claim, I.R.C.P. 12(b), and prayed for dismissal of all claims against it. Additionally, following plaintiff-respondent's motion for summary judgment, both parties submitted affidavits and made oral argument. Both sides had adequate opportunity to show whether a genuine issue existed. Such presents appropriate circumstance for the district court to properly grant summary judgment to appellant. *See Just's, Inc. v. Arrington Construction Company, Inc., supra; Idaho State University v. Mitchell,* 97 Idaho 724, 733, 552 P.2d 776, 785 (1976); *Glenn Dale Ranches, Inc. v. Shaub,* 94 Idaho 585, 587 n. 4, 494 P.2d 1029, 1031 n. 4 (1972); 10 C. Wright & A. Miller, Federal Practice and Procedure, Civil § 2720 (1973).

Reversed and remanded.

BAKES, C. J., and McFADDEN, J., concur.

BISTLINE, Justice, dissenting.

Convinced that Judge Ward had a better grasp of the case than does the Court, as reflected in the opinion announced today, and being unable to see any manner wherein Judge Ward erred, I would affirm.

The majority reads this policy in accordance with the simplistic and unrealistic contention of the company by holding that where "[t]here has been no covered loss during the policy period; there can be no recovery," period. Such a reading ignores both the realities of the contract and the findings of the trial court.

For this proposition the Court cites two cases from Texas, neither of which has any application. *Leach v. Eureka Life Insurance Co.,* 580 S.W.2d 628 (Tex.Civ.App. 1979), was, as one might surmise from the caption, a life insurance case, the life insured and there involved, however, not be-

ing the life of a horse.[1] The other case from Texas, *Underwriters at Lloyds, London v. Harkins*, 427 S.W.2d 659 (Tex.Civ. App.1968), did involve a horse, "Benedicto." Benedicto, unlike The Red Pony, was not injured and never recommended for euthanasia. Such was not the issue in Benedicto's case. Benedicto, as was the case with Mr. Leach, simply died after the policy in question had expired. Unlike the policy covering The Red Pony which had a one year term, and no provision covering the situation which developed when The Red Pony was injured near the expiration date, the Benedicto policy contained a 30 day extension clause—that is, 30 days beyond the policy term, and covering the death of Benedicto from any illness which had manifest itself during the period of insurance—*provided*, however, that the illness had been reported to Underwriters in writing before the contract term expired. Failure to gain an extension was the issue. The holding of the Texas court was simply that "[b]y the policy terms, affirmative action on the part of the appellees [owners] was necessary to prevent the automatic termination of the policy on October 31, 1962, and it was uncontested that appellees [owners] failed to give such notification." 427 S.W.2d at 662.

Juker's policy, however, is not a policy which pays for the death of a person during a fixed term. Nor does it involve a horse who sickens during the policy term, and dies thereafter. Rather it involves only The Red Pony who was, so to speak, *fatally injured during the policy term*, but not dying, and in need of euthanasia. It is better, perhaps, to examine Judge Ward's decision with close regard to the policy provisions.

First it must be asked exactly what was required of Juker when The Red Pony became injured. The answer is found under the caption CONDITIONS, ¶ 5, and reads that:

> "It is a condition precedent to any liability that . . . (b) in the event of any . . . injury, accident, or physical disability whatsoever . . . the Assured shall immediately at his own expense employ a qualified Veterinary Surgeon. . . ."

Although the policy does not specifically say so, implicit in its language is the idea that the employed veterinary surgeon use his best efforts and skills (at Juker's expense, nonrecoverable) in saving the horse from destruction. The record is clear that Juker did comply;[2] the company here conceding in its brief that Dr. Monroe examined the horse on January 10, 1978, and undertook its care.

The company also concedes: (1) that it was advised of the injury on January 25, 1978, and that it made inquiry of Dr. Monroe as to the nature of the injury; (2) that the company asked for and received Dr. Monroe's report, by return mail; and (3) that the report was "unfavorable" for racing.

The record is clear that Dr. Monroe (at Juker's expense, nonrecoverable under the policy) continued to treat The Red Pony and by letter dated April 15, 1978, advised that humane reasons necessitated its destruction.

The company, true to its contention that The Red Pony, as is the case with a human whose life is insured, had to actually be dead within the policy period, in its brief concedes that "The Company denied coverage for the expected loss of The Red Pony

---

1. Although this case was not relied upon by the insurance carrier, it does rely heavily on another life insurance case, from California, *Wall v. Equitable Life Assurance Society of the United States*, 33 Cal.App.2d 112, 91 P.2d 145 (1939). There, if a Mr. Whipple had died before the 12th of September, 1936, $3,000 would have been paid. Whipple failed to oblige—living until October 1, 1936. Mr. Whipple was not a horse.

   That *Leach* is both found and cited by the Court is indicative that the Court was per-

suaded by the language of *Wall*, but decided to cite a case 40 years more recent.

2. Paragraph (d) required that Juker was to in either event immediately notify the company, the events obviously being injury under (b), or death, under (c). Juker did not immediately notify the company. The issue of notice, however, was decided adversely to the company by Judge Ward, and the Court does not suggest that his finding is not substantiated.

upon the basis that the policy, as originally issued, covered losses through death of insured animals while the policy was in force...."

It is true, as the company tells us, that The Red Pony did not die within the policy term. The reasons why it did not die are at once obvious. The company's policy required of Juker, as a condition precedent to any recovery, that he hire a veterinarian and spend money in an attempt to save it—which Juker did as pointed out. Juker could have killed the horse,[3] but then where was he? (And, equally pertinent—who was he who would do such a thing without fully exploring the possibility of saving the animal?)

His contract of insurance, which in my view the Idaho Commissioner of Insurance should require to be imprinted with a Catch-22 warning, was very explicit as to Juker's right to do away with the horse—he could not do so without also doing away with his right to the insurance proceeds.

Having complied with the policy condition that he hire a veterinarian and attempt to save the horse, Juker was by reason of that very act of compliance precluded from doing away with The Red Pony under the artfully drawn provisions of the EXCLUSIONS paragraph: "This policy does not cover intentional slaughter of an Insured animal, unless with the consent of the Company."[4]

That the company did not give its consent is evident. The company, notwithstanding its expressed apparent interest in being kept advised as to The Red Pony's progress, simply was thereafter heard to say that this was, after all, a life insurance policy, and the insured life had unfortunately not expired during the term of the policy. Such being the state of affairs, it implicitly tells us that it had no reason to consent or not consent. (But if that be true, then why would it not consent—disclaiming any reason for doing so or not doing so?)

The fallacy of the argument with which the company has persuaded the Court is readily apparent by simply considering the exact same factual situation—changing only the dates. Assume the same injury had happened six months before the term expired. Again we would have Juker complying with his obligation to hire a veterinarian in an effort to save the animal, and again we would have the company showing great interest in the injury and the prognosis—even to the extent of troubling Dr. Monroe to submit a detailed report. We would have the doctor recommending euthanasia, for humane reasons, and we would have the company declining to either consent or not consent. Consent being absolutely necessary, we would have The Red Pony still alive and the insurance policy expired. And, then we would have the company denying liability, as it admits it did here, on the basis that the life insured

---

**3.** *Tripp v. Northwestern Livestock Ins. Co.*, 91 Iowa 278, 59 N.W. 1 (1894), demonstrates the extremes to which the purveyors of such contracts will drive people. There the insurer refused to consent to destruction; the insured saw time running out on his policy; to "protect" himself from having a live horse at the expiration of the term Tripp had the veterinarian shoot the horse and cut a vein in its neck so that it died two hours before the insurance expired.

**4.**                    EXCLUSIONS

"1. This Policy does not cover intentional slaughter of an Insured animal, unless with the consent of the Company, or unless such destruction shall have occurred within six hours after such animal is injured, and then only where such animal was injured or destroyed on a public highway or a public race

course, during a racing meeting, or at any other public event, gathering or place, during a public gathering, and a certificate from a qualified Veterinary Surgeon, certifying that the destruction of such animal was immediately necessary because of its having been accidentally crippled or maimed, shall have been obtained prior to the destruction of such animal."

It is at once obvious that Juker could not both attempt to save the animal and kill it at the same time. If he did decide to kill it, observe that he was out of luck. He had to have done his dastardly deed within 6 hours after the injury, and prior thereto had to have obtained a certificate from a qualified veterinary surgeon, certifying that the destruction was immediately necessary because of the crippling or maiming injury.

did not expire during the policy term. It is inconceivable to me that any one would accept such a monstrously unfair and inequitable proposition. Whether The Red Pony dies or does not die during the policy term, from or because of an injury suffered during the policy term, is not the question. The question is *whether the injury was incurred during the term* and that injury, despite saving efforts, thereafter made it necessary that the horse be destroyed.

Where the company had ample opportunity to decide for itself whether Dr. Monroe's diagnosis and recommendation were sound, of which it made no avail, and where the insured is staring at a policy which tells him that he must not kill the horse without prior company consent, the company simply cannot unreasonably withhold its consent to the destruction of an injured animal. Where an animal is injured but not destroyed within the policy period, the insured cannot be deprived of his recovery under the policy by an unreasonable withholding of consent. In *Horton v. American Home Assurance Co.*, 245 So.2d 136 (Fla.App. 1971), a case relied upon by Juker, and which goes unmentioned in the Court's opinion, the Florida court, confronted with a situation very similar to this one, without any hesitancy, held:

> "It is our view that the insurance company having conceded that the injury was sufficient to justify the destruction of the animal, the right to recover under the policy became fixed, and the fact that the agreed upon destruction was postponed for a humane reason does not as a matter of law defeat the policyholder's rights." *Id.* at 138.

The *Horton* facts must be fully understood in order to grasp the difference between the Florida court's disposition and that made by the Idaho Court today. Horton, *too*, was insured against the loss of his racehorse for a one year period. Six months before the end of the policy term the horse suffered a bad fracture. At the time of the injury a veterinary surgeon diagnosed the injury as incurable and suggested that the animal be destroyed. But,

in an effort to save the horse, surgery was performed. Some six months *after* the policy term, the surgery performed (consisting of three inserted compression screws) caused fragmentation of the sesamoid bone in the right foreleg. The insurance carrier was notified, and the horse was destroyed—some six months after the policy term expired.

Horton was put out of court on the carrier's contention that death had to occur during the policy term—which is exactly the contention Juker faces here, and which the Court finds appealing.

The Florida court disagreed, however, doing so on the basis that contractual rights were fixed at the time of the injury. If the injury was sufficient to justify the destruction of the horse, and it was under the policy of insurance at the time it was injured, postponement of destruction for humane reasons does not defeat the insured's rights.

There is this important difference to be noted in comparing *Juker* to *Horton*, and one which wholly militates against the Court in *Juker* taking up the company cudgel.

In *Horton* it was of the insured's own volition that he expended great sums of money on his horse in order to save it. Here, however, as I have been at great length to point out, Juker was contractually obligated to attempt the saving of The Red Pony, else he had no claim. Such is not a distinction without a difference.

The Supreme Court of Minnesota reached a better result than Juker is handed this day. A registered show mare was the insured horse in *Butler v. Hartford Livestock Insurance Co.*, 261 Minn. 293, 112 N.W.2d 50 (1961). The horse became lame, but had experienced no fractures. Her lameness was attributed to permanent painful injury to the lumbosacral region. Intentional and humane destruction was recommended, and the carrier's consent requested. The carrier neither gave nor refused its consent, and the mare was destroyed. The policy provided for coverage "against loss caused by the intentional destruction . . . within the term

of this policy ... under either of two circumstances ..." of which the pertinent one involved in the litigation was: "2. Where this company shall consent to such destruction." *Id.* 112 N.W.2d at 51–52.

The Minnesota Supreme Court, in affirming the insured's judgment for recovery under the policy, approved the trial court's instruction to the jury which read:

" 'Therefore, if by a fair preponderance of the evidence you find that the mare was here injured in such a manner as to cause it a high degree of pain and suffering which would to a reasonable certainty continue for such a long time as to make it inhumane to keep the mare for further treatment and the advice of the veterinarian was that for humane reasons and because in his opinion the mare had sustained such a permanent and incurable injury as to render her useless for any purpose and that she should be destroyed, then your verdict should be for the plaintiff for $3500 which it was admitted the mare was worth at the time of her injury.' " *Id.* 112 N.W.2d at 52–53.

The Court observed that a *carrier's "consent cannot be withheld arbitrarily* and destruction without consent will not preclude recovery where a jury finds that the animal's suffering had become so great that it would have been inhumane to permit it to live." 112 N.W.2d at 53–54 (emphasis added).

While I do agree with the Court that the covered horse, The Red Pony, did not leave this world before the expiration date of the policy, I join with Judge Ward in seeing that as not at all controlling. This is not a life insurance policy covering a human being, but a livestock mortality policy *which insured Juker against the loss of his horse*[5] from, among other causes, destruction-necessitating injury occurring during the life of the policy. I have no trouble seeing that

an insurance company should not be obliged to respond under its policy where it is the life of a human being which has been insured for a term certain, and the human being has the misfortune, insofar as his beneficiaries are concerned, to remain of this world beyond the policy term, before going on to his reward. But that is a human being, which unlike the chattel known as horse, cannot be summarily shot when he or she breaks a leg. But here, we must pause again. Yes, a horse *is* a chattel, and a race horse is a chattel for but one purpose, namely racing, which truism is especially apt when the particular horse is a gelding as is true with The Red Pony. The economics of owning race horses, of which we can as readily take judicial notice as we do that night follows day, is sadly that any race horse, happening to be an injured gelding, is of no value whatever other than what the packing plants will pay, which while presently not inconsiderable, is a far cry from what such a horse, able, willing and ready to race, will command on the racing market.

So here we have a horse, The Red Pony, against the loss of which George Juker was insured, for a premium.[6] Then we have The Red Pony racing, and without question being injured, while Juker's policy was in effect. And, despite proper medical attention and care, which Juker was contractually required to provide at his expense, we have a totally unquestioned medical determination that, not only can the horse nor race again, the condition of the horse was such that it should be euthanized for humane purposes. In his affidavit in support of Juker's motion for summary judgment, Dr. Monroe stated that in his opinion the injury would never heal properly, and it was and had always been his recommenda-

---

5. As I understand the law, while a man may procure *life insurance* on the life of his wife, I.C. §§ 41–502, 41–1804(1) & (3)(a), a man may not so insure the life of his horse, pig, or chicken, but may procure *casualty insurance* insuring him against loss of or damage thereto. I.C. § 41–506(1)(m).

6. A premium was also paid for a mortality policy from the American Livestock Insurance Co. for the year 1976 covering The Red Pony, but in 1978, and in particular on the 21st day of January, 1978, the company in again insuring Juker did not cover the loss of The Red Pony.

tion that The Red Pony be euthanized for humane reason.[7]

Juker, apprehensive that the injuries were indeed beyond repair, called the company, which in turn called Dr. Monroe. It is at once apparent to a reasonable mind that there was absolutely no occasion whatever for these two telephone calls other than to notify the carrier of The Red Pony's injuries and resulting disability—which would be of no concern to the carrier except with regard to the possibility or probability of destruction.[8] It is totally unreasonable to give this controversy proper consideration without facing up to this realization, and it equally defies reason to come to any conclusion other than that such notification by Juker, and the responsive inquiry by his carrier, had no meaning or purpose whatever other than Juker's advising the carrier of the horse's injury and condition—thereby affording the carrier ample opportunity to conduct such further investigation of its own as it believed warranted, which it did by writing Dr. Monroe and asking to be kept informed. Other than that it might be that Juker had the strange notion that his carrier or some of its personnel might be compassionately interested in the injury to The Red Pony, there was no reason for Juker's telephone call, or the responsive call made by the carrier, through the head of its claims department, Mr. Aubrey, to Dr. Monroe. Aubrey's affidavit confirms both his own and Juker's telephone calls; it also contains the confirming letter to Dr. Monroe asking for a report and prognosis. It borders on the ridiculous to indulge in any thought that the insurance carrier then and there comprehended its only involvement was but an idle curiosity in regard to further treatment and progress, and not with the prospect of ultimate destruction of the horse attributable to injuries suffered while racing during the policy period—commonly referred to in the trade as a loss. I think that judges, even as with jurors, are not expected to be completely ignorant of the fact that horses that have been injured in certain parts are ordinarily destroyed.

On being advised that the horse should in fact be destroyed, however, the insurance carrier simply went dead, no longer showing the polite interest which it had theretofore evinced. Its contract of insurance, of which it alone was the author, provides, of course, that intentional disposition of an accidentally injured horse is not covered unless and until done "with the consent of the Company." Simply by going into its shell and *refusing to either give or withhold consent*, the carrier was unilaterally able to dispose of the claim to its own satisfaction—other than that the courts of this state are open to Juker and the other Jukers who believe that their contractual rights have been impinged upon. The trial court here made the carrier honest. I would keep it that way.

Simply put, the issue in this case is not just whether the death occurred within the policy period. The issue here is whether the company had a reasonable opportunity so that it could properly investigate, and whether the company thereafter unreasonably refused to consent to putting the horse to death. On this issue, in granting summary judgment to Juker, the trial court found as follows:

"(1) Plaintiff did provide the defendant with adequate notice of his notice of claim and loss;

"(2) Defendant has unreasonably withheld his consent to the euthanization of THE RED PONY."

"It was my professional opinion that this injury would never heal properly. It was then, and it continues to be my recommendation that The Red Pony be euthanized for humane reasons."

7. The affidavit of Dr. Monroe included the following:

"On January 10, 1978, I examined the left front knee of The Red Pony and took x-rays of the left carpus. At that time I observed that the third carpel bone of the left carpus contained a slab fracture which was in the process of improperly healing and was of such a nature to be irritating the joint because of osteoarthritis.

8. Juker never contended that he could recover the money spent in veterinarian fees and in caring for the animal.

The judgment should be affirmed with an award of costs and attorneys fees.

SHEPARD, J., concurs.

ON PETITION FOR REHEARING

DONALDSON, Justice.

The petition for rehearing in the above entitled action was granted and reargued. The Court has reviewed the record, considered the arguments presented by counsel, and we continue to adhere to the views expressed and the conclusion reached in our earlier opinion.

BAKES, C. J., and McFADDEN, J., concur.

BISTLINE, J., continues to adhere to the views expressed in his dissent in which SHEPARD, J., continues to concur.